TRIANGLE PUBLICATIONS, INC., a Pennsylvania Corporation, Plaintiff-Appellant,

v.

KNIGHT–RIDDER NEWSPAPERS, INC., a Florida Corporation, Defendant-Appellee.

No. 78–1639.

United States Court of Appeals, Fifth Circuit.

July 24, 1980.

Reginald L. Williams, Miami, Fla., Melville B. Nimmer, Beverly Hills, Cal., for plaintiff-appellant.

Steel, Hector & Davis, Talbot D'Alemberte, Patricia A. Seitz, James D. Spaniolo, Miami, Fla., for defendant-appellee.

Before TUTTLE, BROWN and TATE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This case raises significant issues under the laws of copyright and free speech. For years, Courts and commentators have recognized a potential conflict between copyright and the First Amendment.[1] How-

---

1. For some of the leading Court cases, see *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977); *Meeropol v. Nizer*, 560 F.2d 1061 (2d Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978); *Wainwright Sec.,* *Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). The most highly recognized articles include: Goldstein, Copyright and the First Amendment, 70 Colum. L.Rev. 983 (1970); Nimmer, Does Copyright

ever, until the District Court's opinion in the case now before us, 445 F.Supp. 875 (S.D.Fla.1978), no Court had ever held that a copyright suit could be defeated by a First Amendment defense. We affirm the result reached by the District Court, but disagree with the Court's rationale. Contrary to the District Court, we hold that fair use constitutes a valid defense to the copyright infringement suit involved in this case. The majority does not reach the issue of the First Amendment defense upon which the District Court based its judgment for the Appellee.

### I. How It Came About And What Happened

The plaintiff-appellant, Triangle Publications (Triangle), is the publisher of "TV Guide," a periodical containing television schedules and articles relating to television entertainment. The defendant-appellee, Knight-Ridder Newspapers (Knight-Ridder), publishes the Miami Herald Newspaper (the Herald). During the fall of 1977, Knight-Ridder began a campaign to promote a newly developed television booklet which was to be included as a supplement to the Sunday edition of the Herald. Like TV Guide, the booklet contains television schedules and articles related to that media. The supplement was introduced to the public on November 13, 1977, through a colored newspaper advertisement in the Miami Her-

ald. See Appendix. The following week newspaper vending machine posters (known in the trade as rack cards) advertising the booklet were displayed throughout the southern part of Florida. Subsequently, four additional newspaper ads were introduced promoting the booklet, each displaying an actual-sized reproduction of a TV Guide cover next to an actual-sized reproduction of the cover of the Herald's new TV supplement.[2]

In addition, the booklet was advertised in two thirty second television commercials. The first is based on the theme "Goldilocks and the Three Bears." It compares the size of the Herald's former television guide with the Herald's new supplement and with TV Guide, concluding that the former supplement is too large, that TV Guide is too small, but that the new supplement is just the right size for human beings.[3] While TV Guide is not mentioned by name, one of the actors in the commercial is shown briefly with a back-dated copy of TV Guide in hand. The cover of the TV Guide issue is clearly visible. The commercial was used for several weeks and was then discontinued. The second commercial is a monologue. After identifying TV Guide as the competing product, the announcer suggests that the Herald's supplement is a better value for the money because the purchaser gets the entire newspaper, not merely a TV booklet.[4] During the course of his state-

Abridge the First Amendment Guarantees of Free Speech and Press?, 17 U.C.L.A.L.Rev. 1180 (1970); Sobel, Copyright and the First Amendment: A Gathering Storm?, 19 ASCAP Copyright L.Symp. 43 (1971).

**2.** The Herald published a second color ad on November 18, 1977. The Broward Times (Ft. Lauderdale) printed a black and white ad on November 15, 1977. The Keynoter (Marathon, Florida) and the Miami Times each printed a black and white ad on November 17, 1977.

**3.** This is the script of the commercial:
[Narrator]: "This is the story of Sidney Bear, Cindy Bear and Junior Bear. They all love to watch TV, but . . ."
[Middle Aged Man]: "This TV book is too small."
[Child]: "This TV book is too big."
[Middle Aged Woman]: "This TV section is just right."

[Narrator]: "It was the Sunday Herald's new TV book at no extra cost. The three bears loved the new . . . just-right size with its up-to-date and more complete listings. 'Til one day this little blonde kid— uh, but that's another story. . . . Something for everybody. Every day of the week." (Dots indicate pauses, not omitted material.)

**4.** This is the script of the commercial:
"This is TV Guide. When you buy it, that's all you get. No extras. This is The Miami Herald's TV Book. When you buy it, you get a few extras. Like more up-to-date listings, charts that let you see what's on at a glance. It even has extras on top of the extras. And the best part is, even if there's nothing good on TV . . . you can always sit back and read some of the extras. The Miami Herald." (Dots indicate pauses, not omitted material.)

ment, the announcer holds up a back-dated issue of TV Guide with the cover clearly visible. The announcer then puts down the TV Guide and holds up first a copy of the Herald's supplement and then a copy of the Sunday edition of the Herald. This commercial was being used at the time of the District Court's hearing and Knight-Ridder contemplated using it in the future.

The only conduct by the Herald being challenged here is the reproducing of TV Guide covers. The verbal reference to TV Guide made in the second commercial[5] is not being attacked. Since each issue of TV Guide is individually copyrighted, and since magazine covers have in the past been afforded copyright protection, see, e.g., *Conde Nast Publications, Inc. v. Vogue School of Fashion Modeling, Inc.*, 105 F.Supp. 325 (S.D.N.Y.1952), Triangle claims that the Herald's showing of TV Guide covers violates § 106 of the new Copyright Act, 17 U.S.C.A. § 106 (1976).[6] Triangle moved in the District Court for preliminary and permanent injunctions (and also sought damages).

The District Court found that the challenges to the five newspaper ads, the rack cards and the first television commercial were moot for purposes of a preliminary injunction, reasoning that none of these ads

were then being used. Since all that was left was the second television commercial, the Court denied the motion for a preliminary injunction, pointing out that nearly all of the alleged harm had already occurred and that the likelihood of irreparable injury had therefore not been shown.

The Court also denied the motion for a permanent injunction. In so doing, the Court considered four issues. First, the Court considered whether the cover of a magazine is protected by the magazine's copyright, holding that it is. Second, the Court found that the use of the cover was a "display" as defined by § 106(5) of the Act. Third, the Court held that the display was not protected by the defense of fair use. Fourth, the Court held, based on recent Supreme Court cases giving First Amendment protection to commercial speech,[7] that the First Amendment place limits on the law of copyright and that the Herald's display of TV Guide was constitutionally protected activity.

## II. Fair Use

It is undisputed on this appeal that unless protected by fair use or the First Amendment, Knight-Ridder's use of TV Guide covers constitutes as infringement under the copyright law.[8] Accordingly, we proceed

---

5. See note 4, *supra*.

6. Actually, Triangle sued under both the old (1909) Act as well as the new Act. The new Act became effective January 1, 1978. Of the various alleged infringements, the showing of the second commercial is the only post-January 1, 1978 conduct involved in this case. We believe, however, that the result in this case is the same under both the old and new Acts. We therefore limit our analysis to the new Act.

7. E. g., *Bates v. Arizona State Bar*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977).

8. The nature of the asserted infringement is disputed, however. Section 106 of the Act provides:

Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
(1) to reproduce the copyrighted work in copies or phonorecords;
\* \* \* \* \* \*

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to *display* the copyrighted work publicly. (Emphasis added).

Knight-Ridder contends that reproductions of the TV Guide covers were not "displays" under § 106(5). See § 101 (defining display). However, Knight-Ridder conceded at oral argument that it "reproduced" TV Guide covers. Section 106(1). Consequently, while Knight-Ridder's argument that no display is involved seems rather specious, we need not conclusively rule on it here.

We think it also important to point out that we agree with the District Court's analysis and conclusion that the copyright privilege owned by TV Guide clearly applies to protect TV Guide's covers. See 445 F.Supp. at 878–79; see also note 15, *infra*; *Conde Nast Publications, Inc. v. Vogue School of Fashion Modeling, Inc., supra*; 1 Nimmer on Copyright, § 2.04[D][3] at 2–48–2–49 (1978). Knight-Rid-

directly to the question of whether the defense of fair use justifies Knight-Ridder's actions.

The question of fair use has been appropriately described as "the most troublesome in the whole law of copyright." *Dellar v. Samuel Goldwyn, Inc.*, 104 F.2d 661 (2d Cir. 1939). Although no definition of fair use that is workable in every case has ever evolved, a frequently quoted definition of fair use is "a privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner [by the copyright]." *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 306 (2d Cir. 1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967), *quoting* Ball, The Law of Copyright and Literary Property, 260 (1944).

Fair use is "a 'rule of reason' fashioned by Judges to balance the author's right to compensation for his work, on the one hand, against the public's interest in the widest possible dissemination of ideas and information, on the other." *Sobel, supra* note 1, at 51, *quoting* Latman, Fair Use of Copyrighted Works 5 (Sen. Comm. on Judiciary Study No. 141960). The fair use doctrine frequently serves to eliminate potential conflicts between copyright and free speech. See Denicola, Copyright and Free Speech: Constitutional Limitations on the Protection of Expression, 67 Calif.L.Rev. 283, 299, 303–04 (1979) (hereafter cited as Denicola). The doctrine first appeared back in 1841 in *Folsom v. Marsh*, 9 F.Cas. 342 (C.C.D.Mass. 1841), although the precise term "fair use" did not make its appearance until 28 years later in *Lawrence v. Dana*, 15 F.Cas. 26, 60 (C.C.D.Mass.1869). See generally Case Note, Copyright and the First Amendment—*Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc.*, 445 F.Supp. 875 (S.D.Fla.1978), 1979 Wisc.L. Rev. 242, 246 & n.25 (hereafter referred to as Wisconsin Note). Since its beginnings, the doctrine of fair use has been refined, honed, and clarified in many Court decisions. However, the doctrine was not codified until the enactment of the 1976 Copyright Act.

In codifying the concept of fair use, Congress made clear that it in no way intended to depart from Court-created principles or to short-circuit further judicial development:

> The bill endorses the purpose and general scope of the judicial doctrine of fair use, but there is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change. Beyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to particular situations on a case-by-case basis. Section 107 is intended to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way.

H.R.No.94–1476, 94th Cong., 2d Sess. 66 (1976) (House Report), *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 5659, 5680 (referred to as USCCA). See also Sen.Rep.No.473, 94th Cong., 1st Sess. 62 (1975) (Senate Report).

The 1976 Copyright Act instructs Courts to consider four factors—all gleaned from the case law [9]—in determining whether the defense of fair use applies:

> . . . In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;

---

der does not dispute the District Court's opinion on this point.

**9.** See, e. g., *Mathews Conveyor Co. v. Palmer-Bee Co.*, 135 F.2d 73, 85 (6th Cir. 1943), *quoted*

*in* 3 Nimmer on Copyright, § 13.05[A], at 13–51 (1978) (listing considerations very much like those later adopted by Congress).

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C.A. § 107. The statute does not indicate how much weight is to be accorded each factor,[10] but since the statutory formulation is simply a restatement of the case law, it is appropriate to look to the cases for guidance. Our research indicates that of these four factors, Courts have generally placed most emphasis on the fourth factor, the effect of the use upon the potential market for or the value of the copyrighted work. See, e. g., *Time, Inc. v. Bernard Geis Assocs.*, 293 F.Supp. 130 (S.D.N.Y.1968); 3 Nimmer on Copyright, § 13.05(b)(4), at 13–54 (1978) (indicating that the fourth factor is the most important and citing a host of cases).

In analyzing the fair use question, the District Court did not get beyond the first factor. The Court deemed it controlling that the use of the TV Guide covers by the Miami Herald was to obtain commercial advantage. The Court established what amounts to virtually a per se rule that commercial motive destroys the defense of fair use.

Clearly, § 107 makes commercial motive relevant to fair use analysis. But it is certainly not decisive. As the legislative history makes clear:

This amendment is not intended to be interpreted as any sort of not-for-profit limitation on educational uses of copyrighted works. It is an express recognition that, as under the present law, the

commercial and non-profit character of an activity, while not conclusive with respect to fair use, can and should be weighed along with other factors in fair use decisions.

House Report, at 66; U.S.Code Cong. & Admin.News, at 5679. See also Senate Report, at 62; 3 Nimmer on Copyright, § 13.05[A], at 13–52 (1978) (stating that commercial use does not necessarily negate fair use defense and citing string of cases to support proposition).

■ We assume without deciding that a lower Court's finding that there was or was not fair use is normally a finding of fact subject to the clearly erroneous rule of F.R. Civ.P. 52(a). E. g., *Eisenschiml v. Fawcett Publications, Inc.*, 246 F.2d 598, 604 (7th Cir. 1957). However, this Circuit has repeatedly made clear that the clearly erroneous rule does not apply to findings made under an erroneous view of controlling legal principles. E. g., *Rowe v. General Motors Corp.*, 457 F.2d 348, 356 n. 15 (5th Cir. 1972); *United States v. Pickett's Food Service*, 360 F.2d 338, 341 (5th Cir. 1966); *Ferran v. Fleming*, 293 F.2d 568, 571 (5th Cir. 1961). We believe that in viewing commercial motive as conclusive on the question of fair use, the District Court incorrectly applied § 107. Accordingly, its finding of no fair use defense is not subject to a clearly erroneous standard. Rather, we are more free to determine the question of fair use.[11]

■ As § 107 makes clear, the first factor to consider in a fair use analysis is the purpose and character of the use. Here, Knight-Ridder used TV Guide covers for advertisements, and any commercial use tends to cut against a fair use defense.[12]

---

**10.** Indeed, the statute indicates that these four factors are not necessarily exhaustive. The factors specified in § 107 follow the words "shall include." The term "including" is defined in § 101 as "illustrative and not limitative." However, since Congress articulated these four factors and since they are the most important in the pre-1976 Act cases, we believe that normally these four factors would govern the analysis.

**11.** Even assuming the clearly erroneous standard is the appropriate one, we believe that the

District Court's conclusion on the fair use question is indeed clearly erroneous.

**12.** However, we must emphatically reject Triangle's reading of *Tennessee Fabricating Co. v. Moultrie Mfg. Co.*, 421 F.2d 279 (5th Cir. 1970), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1819, 26 L.Ed.2d 91 (1970), for the proposition that in the Fifth Circuit, use of a copyrighted work for advertising can never constitute fair use. In *Tennessee Fabricating*, this Court found that fair use did not apply where defendant copied with only slight changes plaintiff's design for

On the other hand, the precise characteristics of the commercial use in this case caution against too much weight being given to the fact that the use is commercial. Specifically, there was no attempt to palm off Triangle's product as that of the Herald's. Compare *Conde Nast Publications, Inc. v. Vogue School of Fashion Modeling, Inc.,* *supra.* Rather, the advertisement was a comparative advertisement done in a manner which is generally accepted in the advertising industry.[13]

The second factor specified in § 107 is the nature of the copyrighted work. One commentator has argued that because the copy-

righted work—TV Guide—is itself commercial, the defense of fair use should more readily apply. See Wisconsin Note, *supra,* at 261. However, other commentators have argued that "courts have tended to be most receptive to unauthorized use of educational, scientific, and historical works." Note, Copyright Infringement and the First Amendment, 79 Colum.L.Rev. 320, 326 n.42 (hereafter referred to as Columbia Note), citing *Eisenschiml v. Fawcett Publications,* *supra.* In our view, the fact that TV Guide is a commercial publication neither supports nor hurts Knight-Ridder's claim that a fair use defense is appropriate here.[14]

an architectural metal casting unit to be used as a screen or room divider and made photographic reproductions of the design for use in a catalogue. The Court stated that "[t]he doctrine of fair use has no application to the conduct of the defendants." *Id.* at 284. In the course of its opinion, the Court pointed out that the doctrine of fair use is "fully and ably discussed" in *Rosemont Enterprises, Inc. v. Random House, Inc., supra.* 421 F.2d at 284. In *Rosemont,* the Court cited and distinguished a District Court opinion, *Henry Holt & Co., et al. v. Liggett & Myers Tobacco Co.,* 23 F.Supp. 302 (E.D.Pa.1938), which suggests that an advertisement does not come within the scope of fair use.

To begin with, *Rosemont* did not necessarily adopt *Henry Holt*'s position. It simply pointed out that unlike in *Henry Holt,* no advertising was involved. More importantly, in *Tennessee Fabricating,* simply by referring to *Rosemont* for a full discussion of fair use, the Court in no way adopted every fair use principle contained in *Rosemont,* let alone the fair use principles in the many cases cited in *Rosemont.* Triangle thus reads far too much into *Tennessee Fabricating*'s citation of *Rosemont.* Moreover, the language in *Tennessee Fabricating* does not support Triangle's position. Far from adopting a per se rule regarding advertising, the Court made clear that each case must turn on its own facts and that the result in a given case cannot depend on arbitrary or fixed principles. 421 F.2d at 283. Finally, the facts in *Tennessee Fabricating* are readily distinguishable from those here. In that case, defendant in effect stole plaintiff's architectural design for its own use. Here, the Herald has not taken TV Guide's cover to use for its own publication. It has simply shown the cover of TV Guide in a truthful, comparative advertisement.

**13.** As stated, the fact that the commercial use occurred in the course of a truthful comparative advertisement undercuts the significance of the commercial nature of the use. Congress

emphasized that the doctrine of fair use must be flexible. House Report, at 66; U.S.Code Cong. & Admin.News, at 5680; Senate Report at 62. Today, the public interest in comparative advertising is well-recognized. As the Federal Trade Commission has stated:

The Commission has supported the use of brand comparisons where the bases of comparison are clearly identified. Comparative advertising, when truthful and nondeceptive, is a source of important information to consumers and assists them in making rational purchase decisions. Comparative advertising encourages product improvement and innovation, and can lead to lower prices in the marketplace. For these reasons, the Commission will continue to scrutinize carefully restraints upon its use.

16 C.F.R. § 14.15(c) (1980). One affidavit received as a part of the record cites several examples of comparative advertising, including many magazine ads reproducing covers of competing magazines. For example, the January 9, 1978 issue of Advertising Age contains an advertisement for Americana magazine with a display of covers of competing magazines. The December 1977 issue of Media Decisions contains an ad promoting Horizon magazine featuring pictures of covers of competing magazines. An advertisement in the July 8, 1977 issue of New Times promoting that magazine shows covers of Time and Newsweek, two newsweeklys with which New Times competes. Affidavit of Ken Keoughan, Director of Marketing Services, Beber, Silverstein & Partners, Inc. Thus, while the Miami Herald is clearly out to make a profit from its advertisements, there is certainly no palming off of Triangle's work. Rather, the Herald has used various covers of TV Guide for purposes of comparative advertisements.

**14.** The nature of the copyrighted work, while not important in the fair use analysis of this case, may in other circumstances be very im-

The third factor to consider under § 107 is the amount and substantiality of the portion used in relation to the copyrighted work as a whole. Here, Knight-Ridder did not copy what is the essence of TV Guide— the television schedules and articles. It simply reproduced covers of old TV Guide issues. We do not mean to trivialize the covers of TV Guide, but simply emphasize that this factor would have been entitled to more weight had, for example, some of the contents been used.[15]

The fourth factor to analyze under § 107 —the factor which is widely accepted to be the most important, see, p. 1322, is the effect of the use upon the potential market for, or the value of, the copyrighted work. We are simply unable to find any effect— other than possibly de minimus—on the commercial value of the copyright. To be sure, the Herald's advertisements may have had the effect of drawing customers away from TV Guide. But this results from the nature of advertising itself and in no way stems from the fact that TV Guide covers were used. Indeed, assuming that TV Guide covers offer positive artistic enjoyment, the reproduction of these covers in

the Herald's ads may have shown why TV Guide is a better product than the Herald's guide and may have decreased the effectiveness of the ads. At no point has Triangle offered a cogent explanation of the logical link between the showing of TV Guide covers and the alleged harm to the copyright.[16] We cannot see it. And interestingly enough, neither can the commentators. The District Court's opinion has been the subject of several law review discussions. Nearly every commentator agrees that the harm suffered by TV Guide was at most de minimus and that the District Court erred in rejecting the fair use defense. For example, Professor Robert Denicola, in his recent law review article, states:

> The plaintiff suffered absolutely no economic injury whatever from the alleged infringement of its copyright. If the plaintiff loses a significant share of its present market, that would result not from the display of plaintiff's cover in defendant's advertising but from commercial competition with a work that does not in any way make use of plaintiff's copyrighted material. The alleged

---

portant. For example, if a work reproduced for use by students is itself a textbook, the defense of fair use would be far less appropriate than if the work were material prepared for the general public. Senate Report, at 64. Similarly, if the copyrighted work is out of print and cannot be purchased, a user may be more likely to prevail on a fair use defense. *Id.*

**15.** We find unpersuasive Triangle's argument that the cover of TV Guide is *separately* copyrighted and that therefore Knight-Ridder has reproduced an entire copyrighted work. In our view, the cover of a magazine is entitled to copyright protection as part of the magazine, just as a paragraph in a book may be entitled to copyright protection as part of the book. Thus use of the cover of a copyrighted magazine is an infringement. However, it makes no sense to us to say that the use of a cover constitutes the use of "an entire copyrighted work." As a matter of logic and common sense, Knight-Ridder's conduct would have been far more serious had it reproduced entire articles from TV Guide or full pages of TV schedules. In any event, even assuming that Knight-Ridder has reproduced an "entire" work, the idea that the copying of an entire copyrighted work can never be fair use "is an overbroad generalization, unsupported by the

decisions and rejected by years of accepted practice." *Williams & Wilkins Co. v. United States,* 487 F.2d 1345, 1353, 203 Ct.Cl. 74 (1973), *aff'd by an equally divided court,* 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1975) (citing cases).

**16.** The only explanation offered by Triangle at any stage of the litigation is that any time the cover of TV Guide is shown, its value is thereby reduced. We think the reduction in value—if any—of the covers of TV Guide from the showings by the Herald advertisements is so slight as to be immeasurable. There is nothing in the record to indicate any economic harm to the value of back-dated covers of TV Guide used in the Herald's advertisements. Indeed, we have not even a rough indication of the economic value of these covers—either before or after the Herald's ads. As one Court has stated, "To us it is very important that plaintiff has failed to prove its assumption of economic detriment, in the past or potentially for the future. . . . In the face of this record, we cannot mechanically assume [economic detriment] . . . ." *Williams & Wilkins Co. v. United States, supra,* 487 F.2d at 1359.

infringement itself causes no injury to the plaintiff because it does not in any manner substitute for the plaintiff's product. It is difficult to believe that anyone purchases the magazine simply to ponder the cover—the only part reproduced by the defendant. Any harm suffered by the plaintiff results from competition with an independently created work rather than from exploitation of plaintiff's own copyrighted material.

Denicola, *supra*, at 305–06. Similarly, the Columbia Note explains:

> The use in question was at most an "incidental one," and hence encompassed within the fair use doctrine. The fact that the parties were in competition with each other is irrelevant, since the use of the magazine cover—even if it were plaintiff's entire work—could not serve as a substitute for plaintiff's product. Thus, there was no economic detriment to the plaintiff, and defendant's fair use defense should have prevailed. (Footnotes omitted).

Columbia Note, *supra* at 327–28. And the Wisconsin Note observes:

> [T]he court failed to discuss the fourth factor—the effect of the use upon the potential market for or value of the copyrighted work—in the fair use context. While it is true that defendant's purpose in creating and marketing a television supplement was to reap economic benefit by capturing part of the market held by *TV Guide*, defendant's use had no appreciable deleterious effect upon the potential demand for the issues shown, since the programming schedules were out-of-date. In addition, the display of only the cover could have only slightly decreased the value of the articles in the dated issues, if at all. (Footnotes omitted).

Wisconsin Note, *supra* at 262.

Applying the four factors specified in § 107—and giving heavy emphasis to the fourth factor—we conclude that the fair use defense applies in this case and that the District Court erred in holding that it did not. We simply cannot see how Triangle was harmed by the Herald's advertisements. Moreover, the public as well as the Herald benefits from comparative advertising, thus minimizing the importance of the fact that a commercial use was involved.

### III. First Amendment

Thus far the Court is unanimous. The majority concludes that we need not, and should not, reach the First Amendment issue.[17]

### IV. Conclusion

We affirm the decision of the District Court denying Triangle's motions for preliminary and permanent injunctions. However, we do so on the basis of fair use, not on the basis of the First Amendment which we do not reach.

AFFIRMED.

JOHN R. BROWN, Circuit Judge, concurring in part and dissenting in part:

In light of our holding on the fair use question, the majority decides not to discuss the First Amendment issue. Had the District Court found fair use to be a valid defense, I would simply affirm and leave the First Amendment question to another day. However, since the District Court denied the motions for preliminary and permanent injunctions based on the First Amendment, and since, if allowed to stand, the District Court's opinion could create confusion and uncertainty in the Fifth Circuit law of copyright, see Wisconsin Note, *supra*, at 264, I feel compelled to address the First Amendment issue.

Under the Constitution, Congress has the "Power . . . to promote the Progress

---

**17.** Judge Brown dissents for the reasons stated in his dissent. This appellate opinion procedure used in this case is not uncommon. See, e. g., *Gates v. Collier*, 616 F.2d 1268 (5th Cir. 1980); *Usery v. Tamiani Trail Tours, Inc.*, 531 F.2d 224, 239 (5th Cir. 1976); *United States v. Register*, 496 F.2d 1072, 1075–76 (5th Cir. 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 819 (1975); *Stanga v. McCormick Shipping Corp.*, 268 F.2d 544, 546, 551 (5th Cir. 1959). Cf. *Grigsby v. Coastal Marine Service of Texas, Inc.*, 412 F.2d 1011, 1023 (5th Cir. 1967).

of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." Art. I, § 8, cl. 8. However, the First Amendment to the Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . ." The possible tension between these two constitutional provisions has been repeatedly recognized by Courts and commentators.[1]

Under the law of copyright, "protection is given only to the expression of the idea—not the idea itself." *Mazer v. Stein*, 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630, 642 (1954). In 1930, Judge Learned Hand attempted to give some guidance in drawing the line between an idea and an expression. In *Nichols v. Universal Pictures Co.*, 45 F.2d 119 (2d Cir. 1930), Judge Hand recognized that under the copyright laws, "the right cannot be limited literally to the text, else a plagiarist would escape by immaterial variations." *Id.* at 121. The line between an idea and an expression of an idea "will seem arbitrary" no matter where it is drawn. *Id.* at 122. Yet, attempting to articulate the approach for discovering that line, Judge Hand stated in his "abstractions" test:

Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his "ideas," to which, apart from their expression, his property is never extended.

*Id.* at 121.

This "idea-expression dichotomy" is carried forward in the 1976 Copyright Act.

Thus § 102(b) makes clear that copyright protection does not extend to the idea itself. This notion is further articulated in the legislative history. For example, the House Report states: "Wide departures or variations from the copyrighted work would still be an infringement as long as the author's 'expression' rather than merely the author's 'ideas' are taken." House Report, at 61; U.S.Code Cong. & Admin.News, at 5675. The "idea-expression dichotomy" generally provides a workable balance between copyright and free speech interests. As the Ninth Circuit has stated:

[T]he idea-expression dichotomy . . . serves to accommodate the competing interests of copyright and the first amendment. The "marketplace of ideas" is not limited by copyright because copyright is limited to protection of expression. As one commentator has stated: "[T]he idea-expression line represents an acceptable definitional balance as between copyright and free speech interests. In some degree it encroaches upon freedom of speech in that it abridges the right to reproduce the 'expression' of others, but this is justified by the greater public good in the copyright encouragement of creative works. In some degree it encroaches upon the author's right to control his work in that it renders his 'ideas' per se unprotectible, but this is justified by the greater public need for free access to ideas as part of the democratic dialogue." Nimmer, *Does Copyright Abridge the First Amendment Guarantees of Free Speech and Press?*, 17 U.C.L.A.L.Rev. 1180, 1192–93 (1970). *Cf. Lee v. Runge*, 404 U.S. 887, 892–93, 92 S.Ct. 197 [200], 30 L.Ed.2d 169 (1971) (Douglas, J., dissenting).

*Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1170 (9th Cir. 1977).[2]

Prior to the District Court's opinion in this case, no Court had ever held the First

---

1. See the cases and articles cited in note 1 of majority opinion, *supra*.

2. The Supreme Court has never directly faced the possible tension between the First Amendment and the law of copyright. However, in an analogous case, *Zacchini v. Scripps-Howard*

Amendment to be a basis for preventing enforcement of a copyright infringement suit, although a number of Courts had been faced with the issue. For instance, in *Wainwright Sec., Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978), plaintiff, a limited partnership engaging in institutional research and brokerage business, prepared in-depth reports and analysis on nearly 300 corporations, examining major developments, growth prospects, profit expectations, weaknesses and strengths. These reports, which were as long as 40 pages each, were individually copyrighted. Defendant, a weekly financial newspaper, published abstracts of plaintiff's research reports, appropriating plaintiff's language almost verbatim. The District Court entered a preliminary injunction and defendant appealed. The Second Circuit affirmed, rejecting both the fair use and First Amendment arguments. On the First Amendment issue, the Court reasoned that defendants did not merely use plaintiff's news information but took plaintiff's expression of that information.

This Court recently considered the application of the First Amendment to the law of copyright. In *Dallas Cowboys Cheerleaders v. Scoreboard Posters*, 600 F.2d 1184 (5th Cir. 1979), the Dallas Cowboys Cheerleaders sued the Texas Cowgirls, Scoreboard Posters, Inc., and others, claiming among other things, copyright infringement. Five of the Dallas Cowboys Cheerleaders had posed in their official uniforms for a copyrighted poster that was widely sold. Five members of the Texas Cowgirls, a group made up of former Dallas Cowboys Cheerleaders, posed for a poster in uniforms nearly identical to those worn by the Dallas Cowboys Cheerleaders in the original poster. The only difference was that in the latter poster, the girls' uniforms were partially unbuttoned, exposing their breasts. The District Court granted plaintiff's motion for preliminary injunction. This Court affirmed, finding a substantial likelihood of success on the merits. In so doing, it rejected the argument that the District Court failed to heed defendants' rights to publish under the First Amendment. The Court observed that "[t]he first amendment is not a license to trammel on legally recognized rights in intellectual property." *Id.* at 1188. See also *Sid & Marty Krofft Television v. McDonald's Corp., supra* (rejecting defendants' First Amendment arguments with respect to McDonald's use of H. R. Pufnstuf characters in McDonaldland TV commercials; the Court reasoned that defendants appropriated not merely the idea but the expression of the idea as well).

The case law demonstrates that the "idea-expression dichotomy" generally provides a workable framework for separating First Amendment interests (ideas) from

---

Broadcasting Co., 433 U.S. 562, 577 n.13, 97 S.Ct. 2849, 2858 n.13, 53 L.Ed.2d 965, 977 n.13 (1977), the Court did allude to this tension. In *Zacchini*, petitioner performed an act in which he was shot from a cannon into a net about 200 feet away. He performed the act at a county fair in Ohio and his act was videotaped by a reporter for a broadcasting company and shown on a television news program. He sued for damages under a state theory of "right of publicity." The Court held that the Company was not immunized under the First Amendment from damages for its alleged infringement. In a footnote to the opinion, the Court stated:

> We note that Federal District Courts have rejected First Amendment challenges to the federal copyright law on the ground that "no restraint [has been] placed on the use of an idea or concept." *United States v. Bodin*,

375 F.Supp. 1265, 1267 (W.D.Okla.1974). See also *Walt Disney Productions v. Air Pirates*, 345 F.Supp. 108, 115–116 (N.D.Cal. 1972) (citing Nimmer, Does Copyright Abridge The First Amendment Guarantees of Free Speech and Press?, 17 UCLA [L.]Rev. 1180 (1970), who argues that copyright law does not abridge the First Amendment because it does not restrain the communication of ideas or concepts); *Robert Stigwood Group Ltd. v. O'Reilly*, 346 F.Supp. 376 (Conn.1972) (also relying on Nimmer, *supra*).

433 U.S. at 577–78 n.13, 97 S.Ct. at 2858 n.13, 53 L.Ed.2d at 977 n.13. Without trying to read too much into this dictum, we think that the Supreme Court has given at least its most general approval to the "idea-expression dichotomy" principle.

copyright interests (expressions). However, what happens when the idea and the expression are one and the same? For example, with respect to graphic works, the expression is essential to convey the idea. Words may simply not suffice to describe the work. As Professor Nimmer points out, a work of art cannot be described but can only be experienced. He gives as examples the difficulty in trying to describe the "idea" of the *Mona Lisa* or Michelangelo's *Moses.* 1 Nimmer on Copyright, § 1.10[C][2], 1–81 (1978). He argues—and I agree—that in most such cases, the copyright interest should prevail. As he states, "The additional enlightenment contributed to the democratic dialogue by reason of the visual impact of most graphic work is relatively slight as compared with the intellectual impact of a literary work." *Id.* These considerations seem relevant in this case since we are dealing here with graphic works—covers of TV Guide.

As stated, the District Court in this case held that Knight-Ridder's use of TV Guide covers, although not fair use, was nonetheless protected under the First Amendment. The Court reasoned that the copyright laws and the First Amendment created a tension in this case in light of recent Supreme Court cases such as *Bates v. Arizona State Bar*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), giving First Amendment protection to commercial speech. The Court pointed out that these commercial free speech cases demonstrate the importance of advertising. The Court did not rule the Copyright Act unconstitutional but simply held that under the facts of this case, § 106 should not be enforced because of the First Amendment. In the District Court's view, whenever the First Amendment and the Copyright Act create a tension, "the primacy of the First Amendment mandates that the Copyright Act be deprived of effectuation." 445 F.Supp. at 882.

The District Court's conclusion is incorrect for a number of reasons. First, as we demonstrated above, the fair use doctrine provides protection for the Herald's conduct. Thus, the asserted "tension" between the Copyright Act and the First Amendment simply does not exist in this case. The Copyright Act itself provides a safety valve—fair use—to minimize this potential tension. Indeed, the fair use doctrine has been recognized as "a substantial rule of copyright law that can on occasion reduce the inherent tension between free speech and property rights in expression." Denicola, *supra*, at 299. See also *id.* at 303–04.

Second, even assuming fair use was not an appropriate defense, the Court was not compelled to reach the result it did on the basis of the Supreme Court's commercial free speech cases. To begin with, the right of free speech is not absolute and must be analyzed in light of other legitimate interests. See, e. g., *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed. 965 (1977), discussed in note 2, *supra*. Moreover, the right of commercial free speech is afforded even less protection than non-commercial speech. As the Court stated in *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444, 453 (1978): "[W]e . . . have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of non-commercial expression." See also *Friedman, et al. v. Rogers, et al.*, 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979). And none of the Supreme Court's commercial free speech cases involve a copyright question. Moreover, as one commentator points out, *Bates*, which the Court relied on so heavily, involved advertising that was totally banned. See Wisconsin Note, *supra*, at 257 n. 92. Here, Triangle conceded that the Herald could refer verbally to TV Guide and could even have used the facsimile of TV Guide's cover so long as the Herald did not copy or simulate an actual cover of TV Guide. Thus the objective of comparative advertising would not have been completely thwarted.

Finally, and most importantly, the District Court lost sight of the idea-expression dichotomy. The District Court did not consider whether the Herald was adopting only Triangle's idea or its expression as well.

I believe that the Herald's use of TV Guide covers is protected under fair use but reject the argument that the First Amendment confers a privilege on Knight-Ridder to infringe Triangle's copyright. Since my conclusion stems in part from the idea-expression dichotomy, it is necessary to isolate the relevant idea involved here. Neither side really identifies the idea being communicated by TV Guide covers. Apparently, each cover presents a unique way of suggesting that TV Guide is a magazine containing TV schedules and articles about television. The new picture each week suggests that there are new listings and new articles. The Herald could have conveyed that idea by simply showing a facsimile of a TV Guide cover instead of reproducing the expression, namely, an actual cover of TV Guide. Hence, application of the idea-expression dichotomy principle suggests that the First Amendment is not a defense to Triangle's infringement suit.

Alternatively, the idea may be similar to that expressed by any painting or work of art. If Triangle's theory is that the covers of TV Guide are similar to great works of art,[3] then I cannot understand why Triangle relies exclusively on the idea-expression dichotomy instead of analyzing the case as one in which the idea and expression are wedded. As I stated above, I believe that when the idea and the expression are one

and the same, copyright interest should nearly always prevail over the generally incidental First Amendment concerns.[4] Thus even if the Herald could convey the idea of the TV Guide covers only by showing the covers themselves, I believe that the copyright interests should prevail over the asserted First Amendment interests. Indeed, given my difficulty in trying to determine what the "idea" being communicated by the TV Guide covers is, I doubt that the First Amendment interests asserted here are in any way significant.

Accordingly, I believe that in this case the copyright interests clearly prevail over the alleged First Amendment interests. Even where, as here, the idea and the expression are wedded in graphic form, I believe that the First Amendment will rarely prevail over a copyright interest. In any event, if there is a situation where copyright protection must give way to the First Amendment, we certainly do not have such a case here.

In conclusion, I concur in the result reached by the majority and in their resolution of the "fair use" issue. But I would go further and hold that the District Court erroneously found a violation of the copyright laws and a valid First Amendment defense thereto. In a nutshell, I believe the District Court reached the right result for the wrong reason.

APPENDIX

Below is a small-scale, black and white version of the Herald's full page colored ad of November 13, 1977.

---

**3.** Triangle suggests that this may in fact be its theory. On page 5 of its Reply Brief, Triangle argues that the cover of TV Guide should be treated as though it were a masterpiece of graphic art. And at oral argument, Triangle's counsel compared the TV Guide covers to Picasso and Rembrandt paintings.

**4.** Professor Nimmer believes that in certain situations where the idea and the expression are wedded, the First Amendment should prevail over copyright concerns. He gives as an example exclusive photographs of the My Lai massacre. See 1 Nimmer on Copyright, § 1.10[C][2], 1–82 (1978). While I express skepticism that even here the First Amendment would serve as a defense to a copyright suit, this problem is not before us and I therefore do not reach it.

[original ad is] ACTUAL SIZE.

[original ad is] ACTUAL SIZE.

# The Herald's new TV Book.
# It's a little bit bigger
# and a little bit better.

When you open the November 20, edition of the Sunday Herald, you're going to open your eyes to a very de- lightful little surprise: Our new, smaller, more convenient size TV Book.

Although we lopped off quite a few inches around the edges, we added quite a bit to the middle. We now have more listings. (More than TV Guide). Easier to read list-

ings. (Easier to read than TV Guide). More up-to-date listings. (More up-to-date than TV Guide). Plus a few more pluses TV Guide can't even come close to. Namely the umpteen different sections of the Sunday Herald.

Why did we make our new TV Book a little bit bigger than TV Guide?

Simple. We have a little bit more to say than TV Guide.

**The TV Book. At no extra cost in Sunday's Miami Herald.**

TATE, Circuit Judge, concurring:

I concur in the majority's excellent and scholarly opinion insofar as it holds that the defendant's utilization of the plaintiff's copyrighted cover was authorized by the fair use doctrine. Therefore, as the majority correctly notes, proper application of the fair use principle avoids most First Amendment conflicts that might arise.

Nevertheless, in view of the observations contained in the partial dissent, it may be appropriate to note my own view that the idea-expression test should *not* be the sole basis for resolving any potential copyright-First Amendment conflict. In my view, under limited circumstances, a First Amendment privilege may, and *should* exist where utilization of the copyrighted expression is necessary for the purpose of conveying thoughts or expressions. See discussions in: Denicola, Copyright and Free Speech: Constitutional Limitations on the Protection of Expression, 67 Calif.L.Rev. 283 (1979); Note, Copyright Infringement and the First Amendment, 79 Colum.L.Rev. 320 (1979); Note, Constitutional Law—Commercial Speech—Copyright and the First Amendment, 1979 Wisc.L.Rev. 242 (1979); Note, Copyright and the First Amendment, 33 Univ. of Miami L.Rev. 207 (1978).

Admittedly, with proper application of the fair use principle, it is difficult to visualize the rare occasions when the First Amendment may entitle quotation from or reproduction of copyrighted material not otherwise available through fair use. I am, for instance, inclined to agree that, in the case before us, *because fair use adequately served the interests of free expression*, no additional First Amendment protection of expression extended to reproduction of the graphic illustration before us. However, to illustrate my difference with the dissent on this issue, if fair use did *not* protect the defendant's use of the copyrighted cover, then I would agree completely with the district court, for the reasons expressed in its opinion, that the First Amendment prevented the plaintiff from enjoining reproduction of the cover. *Triangle Publications,*

*Inc. v. Knight-Ridder Newspapers, Inc.,* 445 F.Supp. 875 (S.D. Fla. 1978).

In summary, I agree that we should not now decide that the idea-expression dichotomy is the sole touchstone for applying the sensitive and fundamental First Amendment values so as to permit use of copyrighted material in public discussion and expression of thoughts. Instead, I would wait until squarely faced with the attempted prohibition of a use of copyrighted expression not protected by fair use but necessary for the adequate expression of thought. In such a case, the proposed use might, as in the instant case, neither reduce the value of the plaintiff's copyright nor exploit his expression (the values sought to be advanced by copyright protection), and it would then be appropriate to consider this factor in weighing this sensitive First Amendment issue concerning fundamental values of a free society. That conflict is not presently before us, and we properly did not reach it in our panel opinion.