TRIANGLE PUBLICATIONS,
INC., Plaintiff,

v.

KNIGHT–RIDDER NEWSPAPERS, INC.,
a Florida Corporation, Defendant.

No. 78–111–Civ–JLK.

United States District Court,
S. D. Florida.

Feb. 10, 1978.

Reginald L. Williams, Miami, Fla., for plaintiff.

Talbot D'Alemberte, Miami, Fla., for defendant.

ORDER DENYING PRELIMINARY AND
PERMANENT INJUNCTIONS

JAMES LAWRENCE KING, District Judge.

This cause came on for consideration upon the motion of plaintiff for a preliminary injunction. The court, having considered the record and having heard extensive oral argument on this matter, finds and concludes that a preliminary injunction should not issue herein because plaintiff has not demonstrated irreparable injury.

Further, at the hearing on this matter, the court, with the agreement of both parties, announced that once the motion for a preliminary injunction had been determined, this court would proceed to an adjudication of the merits of the permanent injunction. The court does so through the authority granted it under Rule 65 of the Federal Rules of Civil Procedure.

Fed.R.Civ.P. 65(a)(2) authorizes this court to consolidate a preliminary injunction hearing with the trial on the merits after commencement of the hearing. Generally speaking, such a consolidation is proper where the parties are not prejudiced by lack of notice. *Eli Lilly & Co. v. Generix Drug Sales, Inc.*, 460 F.2d 1096 (5th Cir. 1972).

*Cooper v. Wisdom*, 440 F.Supp. 1027 (S.D. Fla.1977) and 11 Wright & Miller, *Federal Practice and Procedure: Civil*, § 2950.

Both parties agreed at the hearing on this matter that a subsequent hearing would not serve to develop further the facts of this case. The court requested that each party submit a supplemental memorandum of law on the issues delineated at the hearing. Those memoranda have been received and carefully scrutinized. Having done so, the court finds and concludes that the motion for a permanent injunction also should be denied.

1. *Factual Background*:

This case presents an issue of first impression in this nation.

Defendant, Knight-Ridder Newspapers, publishes the Miami Herald Newspaper. Within the past few months, the defendant developed a new supplement for its Sunday edition—a television book. This "book" contains listings of the programming scheduled for the week that begins the Sunday it is released. In addition, it contains articles related to the television media and several other features, such as a segment which proffers prime time viewing at a glance.

Plaintiff publishes the periodical known as the "TV Guide". This publication, which predates defendant's newspaper supplement by over ten years, provides daily listings of television programming for the week along with articles relating to the television media. It is sold as an independent unit on the newsstand and its price generally is set at thirty cents an issue.

In an effort to advertise this new addition to its Sunday edition, the Herald engaged in a campaign of newspaper and television advertisements over the last few months. The new supplement was formally introduced on November 13, 1977 with a color newspaper advertisement in the Miami Herald. The following week, temporary cards for the exterior of newspaper vending machines, known as "rack cards", were distributed. Neither the newspaper ads nor the rack cards are currently being utilized by the Herald.[1]

The Herald used five newspaper ads in its advertising campaign. These ads were published in color in the Herald on November 13, 1977 and November 18, 1977; in black and white in the Broward Times on November 16, 1977; and in black and white in the Keynoter (Marathon, Florida) and the Miami Times on November 17, 1977. The promotional campaign does not contemplate further use of any of these advertisements.[2]

Second, the rack cards were made of cardboard and their life expectancy, after exposure to the elements, was but a few weeks. Instructions were given by the Herald prior to the institution of this suit to have the rack cards at issue replaced with new cards bearing different promotional messages unrelated to the television supplement. Such a replacement was ordered in the regular course of business.[3]

Third, two different television commercials, each thirty seconds in length, were utilized in the promotional campaign. The court has viewed each of these commercials. The first, which revolves around the theme of Goldilocks and the Three Bears, emphasizes the comparative sizes of the TV Guide; the Herald supplement; and a magazine of a size larger than the Herald supplement. The conclusion of the ad is that the Herald supplement is the perfect size for human beings. While this commercial does not mention TV Guide by name in its dialogue, a past issue of TV Guide (the issue for the

---

1. Affidavit of Fred J. Barger, Circulation Promotion Manager for the Miami Herald, January 19, 1978.

2. *Id.*

3. *Id.*

week of October 29–November 7, 1977) is shown briefly in the hands of one of the actors. This "Three Bears" commercial was first shown on November 17, 1977 and it was aired thereafter for several weeks. It since has been displaced and its use is no longer contemplated.

All of the above newspaper advertisements and this first television advertisement are moot for the purpose of the preliminary injunction. They are delineated above for the sole purpose of developing a context within which to understand the issues involved herein and because they are germane to the issuance of a permanent injunction and/or the determination of damages.

However, there was one advertisement in existence at the time that this hearing was held. This commercial featured a monologue of thirty seconds duration. This commercial visually identified the competing product, TV Guide, for a few seconds and urged the viewer to purchase the Sunday Herald television supplement. The thrust of the commercial is that the purchase of TV Guide procures TV Guide for the consumer while the purchase of the Herald supplement inextricably entails the purchase of the Sunday Miami Herald since it accompanies that newspaper without extra cost.[4] Hence, the theory is that there are more "extras" when one purchases the Sunday Herald television supplement. The TV Guide utilized in this commercial was depicted clearly on the screen, though it was a past issue of that periodical. This commercial was scheduled to run through February 5, 1978 and testimony indicated that it might be utilized several times after that date.[5] For the purpose of the preliminary injunction, it is the only advertisement in issue at the time of the hearing.

Plaintiff complains that defendant utilized a copyrighted item without plaintiff's permission—the cover of the TV Guide displayed by the actor delivering the monologue. Plaintiff alleges that this use is in contravention of the new copyright act, 17 U.S.C. § 101 *et seq.*, because it constitutes a display by another of a copyrighted item whose display is within the exclusive province of the item's creator. *See*, 17 U.S.C. § 106.[6]

2. *The Preliminary Injunction*:

■ In order to secure a preliminary injunction, plaintiff must demonstrate that it will suffer irreparable injury should the injunction be denied.[7]

Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.

---

4. The monologue consisted of the following message:

This is a TV Guide. When you buy it . . that's all you get . . . no extras.
This is the Miami Herald's TV Book. When you buy it . . . you get a few extras . . . like more up to date listings . . charts that let you see what's on at a glance . . . It even has extras on top of the extras . . . And the best part is . . even if there's nothing good on TV . . . you can always sit back and read some of the extras. (dots indicate pause, not deleted material).

5. Affidavit of Fred J. Barger, *supra*.

6. § 106. *Exclusive rights in copyrighted works*
Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;
(2) to prepare derivative works based upon the copyrighted work;
(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly, and
(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of motion picture or other audiovisual work, to display the copyrighted work publicly.

7. *Buchanan v. United States Postal Service*, 508 F.2d 259 (5th Cir. 1975).

11 Wright & Miller, *Federal Practice and Procedure: Civil,* § 2948. Plaintiff has not done so here.

The comparative advertising at issue in the complaint was initiated in the form of a newspaper advertisement as early as November of 1977. From November, 1977 to the date on which this suit was filed, January 9, 1978, five newspaper ads in three different newspapers were printed and numerous rack cards advertising the new supplement were displayed. In addition, the first television commercial (i. e. The Three Bears) initially was aired on November 17, 1977 and was shown thereafter for several weeks. Even the second commercial, known as "Extras"—the only alleged infringement at issue on this motion for a preliminary injunction—had been aired several times prior to the institution of this suit.

In these circumstances, this court cannot find that the issuance of a preliminary injunction is required in order to avert irreparable injury. In *Poe v. Michael Todd Co.,* 151 F.Supp. 801 (S.D.N.Y.1957), plaintiff's failure to file a motion for injunctive relief until three months after the alleged infringing motion picture was released was an important factor in the court's decision to deny a preliminary injunction.

The deleterious impact incurred through the airing or printing of advertisements related to the television supplement in the case *sub judice* undoubtedly would have occurred, in large part, by the time of this hearing. All of the advertisements complained of had run or had begun running prior to the institution of this suit.

Therefore, the motion for a preliminary injunction must fall of its own weight.

### 3. The Permanent Injunction:

The request for a permanent injunction involves several issues. This court must consider *seriatim*:

a) whether the cover of a magazine is protected under the umbrella of a copyright granted to the creator of that magazine?

b) whether the display of the copyrighted item was the type of fair use contemplated by the new Copyright Act?

c) whether the Copyright Act is affected by the First Amendment with regard to the activities involved herein?

### A. The Cover and the Copyright:

Defendant contends that the copyright registered for TV Guide only pertains to the matters bound between its covers. Defendant relies on the fact that TV Guide's copyright appears on its masthead page and reads, *inter alia,* that "no material *in*" TV Guide can be used without permission (emphasis added).

While plaintiff's copyright notice *literally* is confined to the contents of this periodical, this court does not believe that the cover of TV Guide was meant to be excluded from the protections afforded by the copyright. In this regard, *Conde Nast Publications v. Vogue School of Fashion Modelling, Inc.,* 105 F.Supp. 325 (S.D.N.Y.1952) is quite significant.

At issue in *Conde Nast* was the question of whether the cover of the magazine "Vogue" was encompassed within the penumbra of protection afforded by its copyright. Its decision to extend the protection to the magazine's cover was heavily influenced by the fact that

the cover of each magazine was used to indicate the particular feature emphasized in that issue. Such a relation between the subject matter of the cover and the text of the magazine makes the cover an integral part of the magazine falling within the protection of the copyright of the latter as a 'copyrightable component part' of it.

*Conde Nast,* at 332–333. In conjunction with this finding, the court noted that plaintiff placed special emphasis on its covers. Those covers contained color photographs of "attractive and strikingly attired live models." *Conde Nast,* at 328. In effect, the cover of Vogue was a genuine link to the contents upon which it rested.

This court believes that the cover of TV Guide may be characterized in a like man-

ner. A typical cover, such as the one that appears on the issue for the week of Oct. 29–Nov. 4, contains a large-type title of a leading article related to television within. In addition, a large color portrait of a television personality dominates the majority of the cover space. Indeed, the emblem on the cover and the size of this periodical truly have become associated with the substance of the periodical. This cover was designed for a function greater than that served by a blank face sheet or cardboard binding. It symbolizes, to a significant degree, the essence of the periodical to which it is attached. It is a link between that which is seen on the newsstand and the benefits which a purchase portends.

*Conde Nast* suggests that this type of cover is within the ambit of copyright protection. Indeed, if it were not a distinctive cover and of some importance in revealing the contents of the periodical to which it is attached, one might query why defendant chose to display it as a prop in its comparative advertisements rather than simply discuss it by name.

This court finds further support for this conclusion in the writings of one of the foremost authorities on copyright, Professor Melville Nimmer. Professor Nimmer is emphatic in his conclusion that in almost all cases, except where the magazine cover is truly indistinguishable, the cover is part of the copyrighted material associated with the magazine. As he has written,

> It has been suggested that this principle is not applicable to the cover of a magazine or other work unless the cover bears some relationship to the contents of the work. It is reasoned that unless there is a relationship of subject matter between the cover and the content of the work, the cover does not constitute a component part of the work. This reasoning is specious since nothing in the wording of Sec. 3 of the Copyright Act, nor in the essential meaning of 'component part', requires a unity of subject matter. A magazine cover is by definition necessarily a component part of the work which it covers. Therefore, if the cover embodies sufficient originality so as to render it separately copyrightable, then regardless of its subject matter it should be regarded as a 'copyrightable component part' of the entire magazine and hence protectible under the general copyright for the magazine pursuant to the provisions of Sec. 3.

M. Nimmer, 1 *Nimmer on Copyright* § 14.4, at 62.

Thus, the first issue must be answered in the affirmative. The cover of "TV Guide" was encompassed within the protections afforded by the copyright registered for that magazine.

### B. *Display and the Doctrine of Fair Use:*

■ Defendant's use of TV Guide constitutes a "display" within the ambit of the Copyright Act. The new act, 17 U.S.C. § 101 *et seq.,* provides that the term "display" includes a showing of a "copy" of the work in question via television, where "copy" includes the original depiction of the work. *See,* 17 U.S.C. § 106, historical note.

Under § 106, the right to display a copyrighted work lies exclusively within the possession of the holder of the copyright. However, a judicial exception to this limitation, now codified in 17 U.S.C. § 107, has been developed under the rubric of "Fair Use".[8]

> (1) the purpose and character of the use, including whether such use is of a *commercial nature or is for nonprofit educational purposes;*
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work *as a whole;* and
> (4) the effect of the use upon the potential market for or value of the copyrighted work. (emphasis added).

---

8. § 107. *Limitations on exclusive rights: Fair Use*

Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as *criticism, comment, news reporting,* teaching, (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

In determining whether a party's action fulfills the criteria of the fair use exception, the statute requires this court to consider several factors.

The first required factor centers on the *purpose* for which the defendant utilizes the copyrighted work. In this regard, it should be noted that the development of fair use as a judicial doctrine was catalyzed by the importance of permitting non-profit educational institutions to utilize portions of a copyrighted work and the perceived need for the media to be permitted to disseminate criticism, literary or otherwise, of a work submitted for public consumption. *See,* 23 A.L.R.3d 139 "Copyright—Fair Use Doctrine".

The use of a copyrighted work by a commercial enterprise for commercial advantage was not the primary concern in the development of the fair use doctrine.

> The defense of fair use is most universally recognized in connection with the function of literary criticism. Here substantial passages may be quoted since clearly the review merely supplements but does not replace the function of the work being reviewed. Closely related is the recognition of the defense of fair use where defendant's work is used for scientific or historical or educational purposes.

Nimmer, 2 *Nimmer on Copyright* § 145 (cit. omit.).

Indeed, the statute and prior case law indicate that the use of a copyrighted item in pursuit of a commercial purpose would redound to an alleged infringer's disadvantage. *See* 17 U.S.C. § 107(1). Under the new act, Congress decided to alter 17 U.S.C. § 107 by adding the phrase "including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107, historical note. A commercial purpose clearly was intended to contrast with one aligned with non-profit education.

Defendant further contends that the exception to the exclusivity of the copyright privilege carved out for uses made in the pursuit of "criticism" clearly was meant to encompass the comparative advertising at issue herein. This court finds that this argument is specious. As recited above, case law compels the conclusion that the "criticism" exception was developed to encompass those writings commonly regarded as literary or cinematic reviews—not commercial critiques designed to enhance the marketability of a particular product.

It is true, as defendant notes, that the open ended quality of the judicial "fair use" doctrine was intentionally preserved by the framers of the new act. However, this was done in order to accommodate the perpetually unsettled quality associated with the *technological* production and dissemination of ideas, products and artistic creations. The fluidity built into the statutory fair use exception is premised on the flux which is endemic to the *means* of transmission—not the substance transmitted. The fluidity built into the statute was designed to diminish the difficulty which arises when an innovation in technology makes possible new techniques of display that could not be contemplated by legislators in the year the statute was framed.

When defendant contends·that the fluidity of the fair use doctrine would support the advent of comparative advertising as a form of permissible "criticism", it misconstrues the purpose of 17 U.S.C. § 107. Defendant admits that commercial criticism—indeed comparative advertising—has existed for many years. *See,* Tr. Oral Arg. at 24–30. Yet, the fluidity of the statutory exception of "fair use" was oriented toward the unknown—not the known. Thus, defendant must fail in its attempt to utilize the fair use doctrine to support the type of *commercial* criticism it seeks to purvey herein. *See, Loew's Inc. v. Columbia Broadcasting System, Inc.,* 131 F.Supp. 165 (S.D.Cal.1955).

Finally it should be noted that defendant's criticism of plaintiff for failing to distinguish *Mura v. Columbia Broadcasting System, Inc.,* 245 F.Supp. 587 (S.D.N.Y.

1965) is also misplaced. *Mura* supports plaintiff's position in terms of the inapplicability of the fair use exception herein.

In *Mura*, plaintiff was concerned that a copyrighted item—hand puppets—were being utilized by Captain Kangaroo in violation of plaintiff's exclusive rights therein. The court did not agree because the puppets were being utilized for the purpose intended by the *plaintiff*. Plaintiff had created the puppets to be sold to consumers and then utilized by them in puppet shows or demonstrations. The utilization made of the puppets by Captain Kangaroo on his show clearly constituted a use contemplated, if not intended, by the plaintiff-creator.

In the case *sub judice*, defendant is not utilizing TV Guide for a purpose reasonably contemplated by plaintiff when plaintiff created TV Guide for public consumption. TV Guide was meant to be used as an aid in the enjoyment of television—not as a comparative advertising prop. Thus, *Mura* would serve to strengthen plaintiff's position.

In line with *Mura*, this court notes, in passing, that defendant's concern with the impact of an injunction in this case upon a person walking down a street inadvertently displaying a copy of TV Guide to other pedestrians is unfounded. The fact that such a person would be carrying a copy of TV Guide in plain view of others would hardly constitute a use of TV Guide that was not intended by its creator. All purchasers of TV Guide surely could not be expected to retain their copies in brown paper bags. Additionally, the sale of TV Guide by a door-to-door salesperson or at a newsstand would not constitute an infringement for such sale is essential to the remuneration of TV Guide's creator and therefore, its occurrence surely would be within the ambit of intended uses.[9]

In sum, defendant has not properly invoked "fair use" as a justification for its activities. Nevertheless considerations of a constitutional nature compel this court to deny the injunction sought.

This court proceeds beyond a consideration of the fair use doctrine because an interest of greater magnitude is at stake in this case—the interest in preserving the sanctity of free speech, as protected by the First Amendment.

## C. The Act and the First Amendment:

The primacy of the First Amendment in a free society has long been acknowledged. Justice Cardozo has written that the

> Freedom of thought and speech . . . is the matrix, the indispensable condition, of nearly every other form of freedom. With rare aberrations a pervasive recognition of that truth can be traced in our history, political and legal.

*Palko v. State of Connecticut*, 302 U.S. 319, 326–27, 58 S.Ct. 149, 152–53, 82 L.Ed. 288 (1937). Several years later, Justice Rutledge reiterated the fundamental quality of free speech in a democratic society when he wrote that *Thomas v. Collins* confronted the High Court

> again with the duty our system places on this Court to say where the individual's freedom ends and the State's power begins. Choice on that border, now as always delicate, is perhaps more so where the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment. That priority gives these liberties a sanctity and a sanction not permitting dubious intrusions. And it is the character of the rights, not of the limitation, which determines what standard governs the choice.

323 U.S. 516, 529–30, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945) (cit. omit.). Also, *see, New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

The Copyright Act, since its inception, has spawned a subtle tension within the

---

**9.** Defendant also reads 17 U.S.C. § 113(c) out of context. That section simply is inapplicable to the facts before this court.

protective environment surrounding the freedom of speech. *See,* Nimmer,1 *Nimmer on Copyright* § 9.2. While there can be little doubt of the constitutionality of such a statute at this point in our judicial evolution, courts cannot permit that statute to sweep in an unnecessarily broad manner.

The primary purpose of the Copyright Act is to stimulate creativity for the public welfare and to preserve for the creator the right to retain the written work unpublished or to publish it and derive monetary compensation therefrom. *See,* Nimmer, 1 *Nimmer on Copyright* § 9.2.

> For copyright, the familiar constitutional phrase: 'to promote the progress of science and the useful arts' sums up the primary raison d'etre for the protection of literary and artistic works. That is, congressional authorization to grant to individual authors the limited monopoly of copyright is predicated upon the dual premises that the public benefits from the creative activities of authors and that the copyright monopoly is a necessary stimulus to the full realization of such creative activities. In addition to and distinguishable from the economic rationale, there is also the author's interest in privacy. This second reason for copyright is mainly, though not entirely, applicable to unpublished works in what is today known as the sphere of the common law copyright.

Nimmer, 1 *Nimmer on Copyright* § 9.221, at 28.8–28.9.

In essence, the Copyright Act, like the First Amendment itself, aims to ensure that our society will continue to receive vital contributions from individuals who otherwise might be discouraged from doing so if the potential for reward was in jeopardy of usurpation by those who were more adept at packaging than creation. Both laws militate in favor of similar objectives. The Copyright Act seeks to diminish the threat posed by the person who can commercially release a copy of a creation more quickly than the creator. The First Amendment seeks to allay the threat posed by the person who can release his words with greater

speed, volume and punch. Both laws are oriented toward the preservation of an atmosphere conducive to the interchange of ideas.

When the Copyright Act and the First Amendment both seek the same objective, their future coexistence is easily assured. However, when they operate at cross-purposes, the primacy of the First Amendment mandates that the Copyright Act be deprived of effectuation. Rather than strike down an entire act as overbroad in such a situation, the judiciary prefers to interpret such a statute as narrowly as needed to preserve it for the effectuation of those of its purposes deemed consistent with the Constitution. As Justice Brandeis explained in *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346, 348, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J. concurring op.)

> The Court developed, for its own governance in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision. They are:
>
> \*    \*    \*    \*    \*    \*
>
> 7. 'When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' *Crowell v. Benson,* 285 U.S. 22, 65, 52 S.Ct. 285, 76 L.Ed. 598 (1932).

*See,* Breyer, "The Uneasy Case for Copyright: A Study of Copyright in Books, Photocopies, and Computer Programs," 84 *Harv.L.Rev.* 281 (1970).

Until recently, it would not have appeared that the present situation would have forced this court to reach such a juncture. However, the recent extension of First Amendment protection to commercial speech induces a conflict between the Copyright Act and the First Amendment herein. As defendant notes, *Bates v. Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810

(1977), is of great significance in this regard.

*Bates* involved the advertisement of legal services in contravention of an Arizona rule. In striking down the rule on First Amendment grounds, the Supreme Court emphasized that

> significant societal interests are served by such [commercial] speech. Advertising, though entirely commercial, may often carry information of import to significant issues of the day. And commercial speech serves to inform the public of the availability, nature, and prices of products and services, and thus performs an indispensable role in the allocation of resources in a free enterprise system. In short, such speech serves individual and societal interests in assuring informed and reliable decisionmaking.

*Bates*, at 2699.

This clear statement about the importance of advertising to the dissemination of ideas in a free society bears heavily on the matter presently before this court. The comparative advertising at issue here was clearly undertaken to inform the public that they should purchase the Miami Herald TV supplement rather than buy TV Guide because it provides more value for the money. Such comparative advertising, when undertaken in the serious manner that defendant did herein, represents an important source of information for the education of consumers in a free enterprise system.

In opposition, plaintiff contends that the Copyright Act was developed in order to protect a creator's work from all deleterious competitive effects. *See*, 23 A.L.R.3d 139, "Copyright—Fair Use Doctrine," at 190. Although this contention may be justified as a literal application of the law, the "deleterious competitive effect" envisioned by the framers of the Copyright Act did not center on the disadvantage which arises from the perceived commercial superiority of a product, whether that perception by the public be justified or not. Rather, the deleterious effect which the Act seeks to

avert is that which accompanies the reproduction, by another, of "so much of the original . . . as will materially reduce the demand for the original due to the demand having been partially satisfied by the alleged infringing production." 23 A.L. R.3d at 190, n.10.

Hence, there is a conflict between the First Amendment and the Copyright Act, if as the plaintiff contends, the Act should be applied in the case *sub judice* to strike down defendant's activity. This court believes that plaintiff is seeking to impose too literal an interpretation of 17 U.S.C. § 106.

The purposes of the Copyright Act, as delineated above, would not be served by the invocation of § 106 in the present situation. In so finding, this court is construing the Copyright Act in a fashion which preserves its constitutionality and its statutory purpose. To extend it to the activities at issue would be a disservice to its goals and would place it in jeopardy of unconstitutionality.

Indeed the grave problems associated with plaintiff's position are underscored by plaintiff's willingness to concede that it probably would not have filed this suit had defendant utilized a simulation of the genuine copyrighted item.[10] Such a concession inveighs against the importance of issuing an injunction herein in order to effectuate the purpose of the Copyright Act. That is, it is hard for this court to understand how the goal of preserving potential remuneration for the creator would be served by an injunction against defendant's use of the actual copyrighted item in its comparative advertisement when plaintiff is prepared to concede that defendant's use of a "mock-up" would have been acceptable. In fact, it appears to this court that it was to plaintiff's advantage that defendant utilized the actual item rather than a simulation which could have contained flaws or have been an ungenerous representation of plaintiff's talents.

---

**10.** Tr. Oral Arg. at 25 (statement of Mr. Abel, in-house counsel for plaintiff) and at 41 and 45

(statement of Mr. Williams, counsel for plaintiff).

In addition, plaintiff's concession leads this court to believe that plaintiff's concern is not that defendant will reproduce so much of plaintiff's works as to encroach upon plaintiff's sales—the primary concern of the Copyright Act's framers. Indeed, it is clear to this court that defendant did not seek to induce confusion as to product identity. Rather, defendant sought to contrast its product with that of the plaintiff. This activity is consistent with the purpose of the Copyright law.

In sum, this court concludes that the co-existence of the Copyright Act and the First Amendment will be assured and the goals of the Act be effectuated if defendant's activity is not enjoined. As the Supreme Court noted in *Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954),

> 'The copyright law, like the patent statutes, makes reward to the owner a secondary consideration.' . . . However, it is 'intended definitely to grant valuable enforceable rights to authors, publishers, etc., without burdensome requirements . . . .'
>
> The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.' Sacrificial days devoted to such creative activities deserve rewards commensurate with the services rendered.

By denying the requested injunction herein, this court cannot envision that the creators of the future will be deterred in any way from investing their efforts in productions beneficial to society as a whole. In fact, this order should, if anything, provide a stimulus for the creation of products which their progenitors believe to be better than the products currently on the market.

Comparative advertising, as practiced by defendant in the case *sub judice*, is in harmony with the fundamental objectives of free speech and free enterprise in a free society. Therefore, it is

ORDERED AND ADJUDGED that the motions for a preliminary injunction and a permanent injunction be and the same are hereby denied.

DONE AND ORDERED in chambers at Miami, Florida, this 10th day of February, 1978.