ROY EXPORT COMPANY ESTABLISHMENT OF VADUZ, LIECHTENSTEIN, et al., Plaintiffs-Appellees-Cross-Appellants,

v.

COLUMBIA BROADCASTING SYSTEM, INC., Defendant-Appellant-Cross-Appellee.

No. 13, Docket 81–7027.

United States Court of Appeals, Second Circuit.

Argued Sept. 21, 1981.

Decided March 4, 1982.

Carleton G. Eldridge, Jr., New York City (June A. Eichbaum, John M. Keene, III, Peter M. Nelson, Ronald E. Guttman, and Coudert Brothers, New York City, on the brief), for defendant-appellant-cross-appellee.

Stuart Robinowitz, New York City (Steven B. Rosenfeld, Mary B. Seyferth, Howard A. Smith, and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief), for plaintiffs-appellees-cross-appellants.

Before NEWMAN and KEARSE, Circuit Judges, and DALY,* District Judge.

NEWMAN, Circuit Judge:

Although the 1976 Copyright Act, 17 U.S.C. app. §§ 101–810 (1976), prospectively ended the era of common-law copyright as of January 1, 1978,[1] troublesome questions will continue to arise for some time concerning the availability of pre-1978 common-law protection for intellectual property.[2] Some of those questions are among the issues presented by this appeal from a judgment of the District Court for the Southern District of New York, awarding compensatory and punitive damages to plaintiffs-appellees Roy Export Co. and others[3] for statutory and common-law copyright infringement and unfair competition by defendant-appellant Columbia Broadcasting Systems, Inc. (CBS). The underlying action arose from CBS's 1977 network television broadcast of a film biography of Charlie Chaplin, which included a collection of film clips from six of Chaplin's motion pictures in which the plaintiffs hold exclusive rights.[4] On appeal, CBS primarily attacks the bases of those claims against it that are grounded in state law, arguing that the plaintiffs had no common-law copyright in any of the works at issue and that the plaintiffs' tort claim for unfair competition was preempted by the federal copyright statute. CBS also argues that the damages award was excessive and duplicative and that, in any event, its conduct was protected by the First Amendment. We reject all of these contentions and affirm the judgment of the District Court.

To understand the relationship among the several works involved in this controversy, it is necessary to trace the history of the parties' competing efforts to create a film memorial to Charlie Chaplin. In 1972, the Academy of Motion Picture Arts and Sciences ("AMPAS") asked Bert Schneider, who along with Mo Rothman acted as the plaintiffs' representative in all matters relevant to this case, to supervise the making of a tribute to Chaplin, in the form of highlights from his motion pictures, to be shown in connection with a proposed appearance by Chaplin at the 1972 Academy Awards ceremony. Schneider in turn secured the services of director Peter Bogdanovich and,

---

* The Honorable T. F. Gilroy Daly of the United States District Court for the District of Connecticut, sitting by designation.

1. The 1976 Act took effect on January 1, 1978. Pub.L.No. 94–553, § 102, 90 Stat. 2598 (1976). The event occasioning this suit occurred a few days before, on December 26, 1977. For most purposes the new Act eliminates the prior distinction between common-law and statutory copyright.

2. The questions will concern not only allegations of pre-1978 infringement of common-law rights, like those presented in this case, but, more significantly, challenges to statutory copyrights, subsisting well into the future, on the ground that the work lost its common-law copyright prior to January 1, 1978, entered the public domain, and was therefore not eligible for statutory copyright. *See* 1 M. Nimmer, *Nimmer on Copyright* § 4.01[B] (1981) (hereafter "*Nimmer*").

3. Roy Export owns the copyrights in several Charlie Chaplin films. The other plaintiffs hold distribution rights and television, theatrical, and non-theatrical rights.

4. The six films are "The Kid," "The Gold Rush," "The Circus," "City Lights," "Modern Times," and "The Great Dictator."

through Bogdanovich, of film editor Richard Patterson. Schneider, Bogdanovich, and Patterson then selected and edited a series of classic scenes from Chaplin's movies, planned the sequence and timing of the scenes, and produced the "Compilation,"[5] a thirteen-minute film montage of the master's greatest hits. The Compilation was televised nationally by NBC as part of the 1972 Academy Awards, at which Chaplin received a special award. It was understood that AMPAS's right to use the Compilation was strictly limited to that one-time showing, and the plaintiffs have not authorized the showing of the Compilation since that date.

In 1973, CBS began work on a retrospective of Chaplin's life, intended for use as a film obituary when Chaplin died. CBS soon learned, however, that the plaintiffs held all rights in the films involved here and that, despite repeated requests, plaintiffs would not grant CBS permission to use the films. The plaintiffs explained their refusal by informing CBS that they had begun production of their own "definitive" Chaplin biography, "The Gentleman Tramp," and therefore would not relinquish their copyright advantage. Rebuffed, CBS prepared a "rough cut" of a Chaplin biography, consisting primarily of public domain footage. The plaintiffs meanwhile completed work on "The Gentleman Tramp," which included some of the same film segments collected in the Compilation but did not use the Compilation itself. The plaintiffs planned to license "The Gentleman Tramp" to theaters abroad and to television networks in the United States. Twice during 1976 and 1977, in fact, the plaintiffs attempted to sell CBS such a license. CBS did not purchase the license, content for the time being with its "rough cut."

Charlie Chaplin died on December 25, 1977. Although CBS had its "rough cut" biography ready for showing, the network elected not to use it, preferring instead to use a copy of the Compilation obtained from NBC. NBC had kept a videotape of the Compilation from its 1972 telecast of the Academy Awards and had provided CBS News with a copy of the videotape on the assurance that CBS would show only brief portions of the excerpted films and only on its regular nightly news program. The copy, however, appears to have found its way to Russell Bensley, director of the CBS Special Events Unit. Although Bensley knew of the plaintiffs' repeated refusals to grant CBS permission to use excerpts from the copyrighted films, and although Bensley was unable to reach Schneider or Rothman to make an eleventh-hour plea for reconsideration, CBS decided to put together a new version of a Chaplin biography, incorporating, with minor editing, the Compilation obtained from NBC. The newer version, heavily dependent on what CBS knew to be copyrighted material, was broadcast on December 26, 1977, in preference to the legally less vulnerable "rough cut."

The broadcast occasioned the plaintiffs' damage suit. They claimed (1) that the broadcast's use of the Chaplin film clips infringed their statutory copyrights in the films, (2) that the use of the clips in the particular form of the Compilation infringed a common-law copyright in the Compilation itself as an unpublished independent creation, and (3) that the broadcast competed unfairly with the plaintiffs' own Chaplin retrospective, "The Gentleman Tramp," whose marketability the plaintiffs had intended to protect with their copyrights in its constituent material. After a trial in September and October of 1979 before Judge Robert J. Ward in the Southern District of New York, the jury found CBS liable to the plaintiffs for $307,281 compensatory and $410,000 punitive damages.[6]

---

**5.** While the parties refer to the work as "the Compilation," for copyright law purposes it is more precisely a "collective work," since its components, excerpts from copyrighted films, are "independent works in themselves," 17 U.S.C. app. § 101 (1976), whereas "compila-

tion" is a broader term that refers to assemblages of materials that may or may not be copyrightable, *see ibid.*; 1 *Nimmer* § 3.02, at 3–5, and therefore includes "collective works."

**6.** Of the compensatory total, $7,280 was for

CBS's post-trial motions were denied in a comprehensive opinion by Judge Morris E. Lasker,[7] who also granted the plaintiffs' cross-motion for an additional award of statutory damages in the amount of $5,000. *Roy Export Co. v. CBS*, 503 F.Supp. 1137 (S.D.N.Y.1980). This appeal followed.

### A. The First Amendment

■ CBS first asserts a generalized First Amendment privilege as a bar to the plaintiffs' claims, arguing that a right to report newsworthy events such as Chaplin's death shields it from liability. CBS points out that the principal reason for Chaplin's fame is to be found in his films, and argues that it is therefore meaningless to attempt a full account of his life without making some use of the very things that make that life worth remembering. CBS claims a limited right to use the "gems" of Chaplin's motion pictures—specifically, those film clips collected in the Compilation—in order adequately to memorialize him at his death. In addition, CBS claims a similar right to use the particular form in which it broadcast the clips, *i.e.*, the Compilation, instead of simply showing independently excerpted film segments. In CBS's view, the 1972 Academy Awards ceremony, at which the Compilation received its single public showing, was an "irreducible single news event" to which the showing of the Compilation was integral. The significance of the ceremony, CBS contends, was not simply that Chaplin appeared after a twenty-year exile provoked by Senator McCarthy's investigations, but that a collection of his work was shown, thereby bringing home to the American people both what they had been deprived of by McCarthyism and how ludicrous had been the attempt to find subversive political innuendo in Chaplin's films. CBS concludes that the plaintiffs' claims for infringement of the copyrights in the films and the Compilation must give way to an asserted First Amendment news-reporting privilege.

CBS's arguments are unpersuasive. It rests its theory on Professor Nimmer's hypothesis that someday, on some facts, there might be such an inseparability of an idea and the form of its expression that protecting free dissemination of the one would necessarily entail subordinating copyright in the other. *See* 1 M. Nimmer, *Nimmer on Copyright* § 1.10[C][2] (1981) (hereafter "*Nimmer*"). Professor Nimmer suggests that the Vietnam War photographs of the My Lai massacre, or the Zapruder film of the Kennedy assassination,[8] might be among the rare instances in which "the visual impact of a graphic work made a unique contribution to an enlightened democratic dialogue," *id.* at 1–82 to –83, rendering the news photograph itself essential for understanding the event, and therefore precluding copyright protections.

No Circuit that has considered the question, however, has ever held that the First Amendment provides a privilege in the copyright field distinct from the accommodation embodied in the "fair use" doctrine.[9]

statutory copyright infringement, $1 was for common-law copyright infringement, and $300,000 was for unfair competition. The punitive damages were divided between the common-law claims: $300,000 for common-law copyright infringement and $110,000 for unfair competition.

7. Judge Ward recused himself after the trial pursuant to 28 U.S.C. § 455 (1976).

8. The unauthorized use of the Zapruder film was at issue in *Time Inc. v. Bernard Geis Associates*, 293 F.Supp. 130 (S.D.N.Y.1968). The suit alleged infringement of the copyright in the film, and the District Court granted summary judgment for the defendants; the court rested its decision on the "fair use" exception, however, not on the First Amendment. Professor

Nimmer finds the fair use rationale unpersuasive on the facts of the case and sees in it an unarticulated First Amendment holding. 1 *Nimmer* § 1.10[D], at 1–86 to –87.

9. Fair use balances the public interest in the free flow of ideas and information with the copyright holder's interest in exclusive proprietary control of his work. It permits use of the copyrighted matter " 'in a reasonable manner without [the copyright owner's] consent, notwithstanding the monopoly granted to the owner.' " *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 306 (2d Cir. 1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967) (quoting Ball, *The Law of Copyright and Literary Property* 260 (1944)). In the District Court, CBS raised a fair use

See, e.g., *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979); *Walt Disney Productions v. Air Pirates*, 581 F.2d 751, 758–59 (9th Cir. 1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979); *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 95 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978).[10] In this Circuit, while we have acknowledged in passing the conceivable occurrence of some "rare," "almost unique" circumstance, such as those surrounding the Zapruder film, in which "it is at least arguable that the informational value of [the] film cannot be separated from the photographer's expression, . . . thereby indicating that both should be in the public domain," *Iowa State University Research Foundation, Inc. v. American Broadcasting Cos.*, 621 F.2d 57, 61 n.6 (2d Cir. 1980), we have also stated the general rule that "[c]onflicts between interests protected by the first amendment and the copyright laws thus far have been resolved by application of the fair use doctrine," *Wainwright Securities, Inc. v. Wall Street Transcript Corp., supra*, 558 F.2d at 95.

■ Moreover, even if we were inclined to recognize some narrow exception on extraordinary facts, we would still conclude that the facts in this case could not support the invention or application of even a limited privilege.[11] The showing of copyrighted films was not essential to CBS's news report of Charlie Chaplin's death or to its assessment of his place in history; public domain films were available for the pur-

pose, and the public is already generally familiar with his work. Nor was the showing of the Compilation essential to a report on the 1972 Academy Awards ceremony. As Judge Lasker noted in his opinion in the District Court, "The audiovisual news event, if there was one, was Chaplin's appearance, not the showing of his work, and certainly not the precise artistic means through which his films were showcased (the Compilation)." 503 F.Supp. at 1148. That the films and the Compilation have historic significance incidental to the events of Charlie Chaplin's life does not place them in the public domain. We conclude on the facts of this case that CBS's effort to secure a First Amendment news-reporting exception to the copyright laws cannot succeed.

### B. *Common-Law Copyright*

CBS next contends that the plaintiffs cannot sue for infringement of a common-law copyright in the Compilation because events have terminated the existence of such a common-law right. The contention arises from the fact that AMPAS affixed a copyright notice in its name to the entire telecast of the 1972 Academy Awards ceremony, during which the Compilation was publicly aired pursuant to AMPAS' one-time-only license. CBS explicitly argues that AMPAS thereby acquired a statutory copyright in the entire show, including the Compilation; its argument implies that if AMPAS does not have a statutory copyright, then either the *plaintiffs* have a statutory copyright, or the Compilation is in the

---

defense to the statutory copyright infringement claim, and Judge Lasker, after a comprehensive inquiry, concluded that the evidence supported the jury in its finding that CBS's use was not fair. *Roy Export Co. v. Columbia Broadcasting System, Inc.*, 503 F.Supp. 1137, 1143–47 (S.D. N.Y.1980).

**10.** CBS cites only one District Court opinion, *Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc.*, 445 F.Supp. 875 (S.D.Fla. 1978), *aff'd on other grounds*, 626 F.2d 1171 (5th Cir. 1980), where a constitutional privilege has been found in the absence of fair use. In *Triangle*, the District Court held that the fair use doctrine did not protect the defendant's use

of a photograph of *TV Guide's* cover in comparative advertisements, but that the First Amendment nonetheless prevented the issuance of an injunction to stop it. That case is alone in its holding and is not even the law of the Fifth Circuit: the affirmance found that the use made of the cover *was* fair, and did not reach the First Amendment issue.

**11.** We therefore need not consider whether the remedy, in the event of First Amendment protection, would be free use of copyrighted material or a compulsory license at a reasonable royalty.

public domain.[12] Any of these theories would defeat the plaintiffs' claim of common-law rights in the Compilation. Assessing them requires brief exploration of copyright law prior to the 1976 Act.

■ The 1909 Copyright Act protects eligible works that are "published" with a copyright notice, 17 U.S.C. § 10 (1976); section 2 of the Act specifically excepts from coverage (and from preemption) the common-law right of an author of an "unpublished" work. 17 U.S.C. § 2. Thus, under the statutory scheme, "publication" generally determines whether state or federal law is the source of any available copyright protection. State law protection begins with a work's creation and continues until the work is "published," at which point state protection is lost. The owner secures federal protection by complying with the requirements of the 1909 Act; if he does not, his published work is in the public domain.[13]

Ascertaining whether publication has occurred, however, is not a simple task. The difficulty arises not only from the normal variety of rulings that are to be expected when courts endeavor to apply an imprecise concept to diverse factual patterns. In addition, and pertinent to our case, is the difficulty arising from the fact that some courts have used "publication" in two different senses, applying different standards depending on the consequences of finding a publication. *See Hirshon v. United Artists Corp.*, 243 F.2d 640, 644–45 (D.C.Cir.1957); *American Visuals Corp. v. Holland*, 239 F.2d 740, 743–44 (2d Cir. 1956). Frequently, when courts speak of "publication," they mean a distribution or other occurrence that has the consequence of leaving an author with no copyright protection: the publication divests him of his common-law copyright, and he secures no statutory protection because he has not affixed a statutory notice in his name. *See, e.g., White v. Kimmel*, 193 F.2d 744, 746–47 (9th Cir.), *cert. denied*, 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357 (1952); *National Comics Publications, Inc. v. Fawcett Publications, Inc.*, 191 F.2d 594, 598 (2d Cir. 1951). When such a "divestive" publication occurs, the author's work enters the public domain. In other circumstances, however, courts use "publication" to mean a distribution sufficient to gain statutory protection for the author who has affixed statutory notice to a copy of his work. *See, e.g., Technicon Medical Information Systems Corp. v. Green Bay Packaging, Inc.*, No. 78–C–363 (E.D.Wis. Sept. 9, 1980); *Cardinal Film Corp. v. Beck*, 248 F. 368 (S.D.N.Y.1918). When such an "investive" publication occurs, the author has simply replaced his common-law protection with statutory protection. When courts are confronted with ascertaining whether publication has occurred, they sometimes insist upon a more extensive fac-

**12.** CBS also argues that AMPAS commissioned the Compilation and therefore holds all rights in it, or if not, that Schneider, Bogdanovich, and Patterson jointly own the Compilation because they created it. These arguments are insubstantial, and Judge Lasker properly rejected them. As to the first argument, although AMPAS originally suggested the idea of creating the Compilation, paid Patterson for his work, and bore production costs, Judge Lasker correctly pointed out that AMPAS exercised no artistic control over the making of the Compilation, that the plaintiffs received no payment for the use of the Chaplin films and gave AMPAS a license to show the Compilation, and that the parties clearly intended to place ownership of the Compilation in the plaintiffs' hands. 503 F.Supp. at 1149–50. All of these factors are inconsistent with a commission relationship. The second argument is even less supportable: Schneider worked for the plaintiffs, as their representative, Bogdanovich worked for free, as a favor to Schneider, and Patterson worked at Bogdanovich's request. Nothing in the record suggests that any of those involved in making the Compilation supposed that the result belonged to anyone but the corporate plaintiffs.

**13.** A related, but distinct, principle is that a single work cannot be protected from copying under both federal and state law at the same time: the beginning of federal protection marks the end of state protection, even if publication has not occurred. Section 11 of the 1909 Act, 17 U.S.C. § 12 (1976), permits an author of certain limited categories of unpublished works to secure a federal copyright by registration and deposit. Such "section 12" registration extinguishes common-law rights. *Photo-Drama Motion Picture Co. v. Social Uplift Film Corp.*, 220 F. 448, 450 (2d Cir. 1915).

tual basis for finding a "divestive" publication than they might have required for finding an "investive" publication.[14] *See American Visuals Corp. v. Holland, supra,* 239 F.2d at 743; 1 *Nimmer* § 4.13[C]. The use of a higher standard for "divestive" publication carries out the policy of the copyright laws to safeguard an author's rights in his works against both piracy and unwitting forfeiture.

The issue of "publication" takes on a further complexity when an author's unpublished work is included as one component of a collective work. Normally, publication of a collective work is also a publication of its preexisting component works. *See 1 Nimmer* § 4.12, at 4–57 n.1.[15] As Professor Nimmer has noted, however, "[T]here is surprisingly little case authority on the question," *id.* at 4–57. Moreover, what case law there is applies the general principle in contexts where the fact of publication was relatively clear: a "divestive" publication had occurred requiring that common-law copyright be sacrificed whether or not the owner would simultaneously be invested with a statutory copyright. If, by contrast, the publication of the collective work is sufficient only to be deemed "investive," then the status of the unpublished component is less certain. Perhaps this is why Professor Nimmer says only that publication of a collective work prior to the effective date of the current Copyright Act "might" divest rights in an underlying work previously protected by common-law copyright. *Id.* § 3.04, at 3–12 n.3.

The uncertainty exists because when an event is adequate to be "investive" but not "divestive," the distinction implies that the single event may constitute publication as to some works or some parties but not as to others, depending on the legal consequences of the determination. If all copyright in a work will be lost, the particular event might not be a publication as to that work; if one copyright will simply be exchanged for another, the same event can safely be labeled a publication for the purpose of acquiring the statutory right. As a result, especially when the proprietor of the component is not the same as the proprietor of the collective work, the legal statuses of the collective work and its preexisting components are potentially independent: if there will be different effects on the rights of different proprietors, an event sufficient to be "investive" but not "divestive" may be deemed a publication as to the collective work but not as to the component.

In this case, it is clear that the 1972 Academy Awards telecast was a collective work that included among its components the Compilation (just as the Compilation was itself a collective work made up of excerpts from the Chaplin films). CBS contends that the 1972 telecast, with AMPAS's copyright notice affixed, was an "investing publication," Appellant's Brief at 27, by which AMPAS became "*invested* with legal ownership of a statutory copyright in all parts of the broadcast," Appellant's Reply Brief at 13, and after which "any alleged common law copyright in the Compilation terminated," *ibid.* The plaintiffs respond that a telecast is a performance and therefore not a publication, and that, even if the telecast was a publication, it would not affect the plaintiffs' common-law rights in the Compilation. If *AMPAS* were pursuing a claim under the federal statute for some infringement of its rights in the entire Awards telecast, it is possible that we would find that the showing, with AMPAS's affixation of notice, was enough of a publication to invest AMPAS with a statutory copyright in the telecast.[16] Because of

14. Though the cases contain much talk of publication occurring upon the sale of a "single copy," *e.g., Bobbs-Merrill Co. v. Straus,* 147 F. 15, 19 (2d Cir. 1906), *aff'd,* 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086 (1908), such statements express the thought that *availability* for public sale constitutes publication, even if actual sales are minimal.

15. The inverse is presumably also true: an event insufficient to constitute publication of the whole is insufficient to constitute publication of the parts.

16. There are factual circumstances that might render inapplicable the normal rule that a telecast is only a performance. Presumably the 1972 program was simultaneously videotaped,

that possibility, we will assume that the 1972 telecast with copyright notice affixed was an "investing" publication as to AM-PAS. We therefore face CBS's arguments concerning the effect of that publication upon the plaintiffs' common-law copyright in the Compilation.

■ The possibility that AMPAS acquired a statutory copyright in the Compilation may be readily rejected. It is axiomatic that copyright is a protection for an *original* work. *See* 1 *Nimmer* § 2.01. Without an assignment from the proprietor of a component, the compiler of a collective work cannot secure copyright protection for preexisting components that he did not create; protection is available only for that part of his product that is original with him—for what he has added to the component works, or for his skill and creativity in selecting and assembling an original arrangement of those works, even if no new material is added. *See* 17 U.S.C. § 7 (1976);[17] *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 909 (2d Cir. 1980); *Mills Music, Inc. v. Cromwell Music, Inc.*, 126 F.Supp. 54, 65 (S.D.N.Y.1954); 1 *Nimmer* § 3.03. For example, when the plaintiffs created the Compilation, they became eligible for copyright protection (common-law or statutory) because the Compilation is an original creative work, distinct from the films on which it draws. But AMPAS made no creative contribution to the Compilation. Without any assignment from the plaintiffs of proprietary rights in the Compilation, the statutory rights AMPAS may have acquired in the telecast can extend only to its original contribution to that collective work, not to the pre-existing Compilation. *See Gilliam v. American Broadcasting Cos.*, 538 F.2d 14, 19–20 (2d Cir. 1976).[18]

see 1 *Nimmer* § 1.08[C], at 1–51, since CBS physically obtained the Compilation from NBC's tape of the 1972 program. We are not informed, however, whether any "distribution" of such a copy, by coaxial cable or otherwise, sufficient to constitute a publication, occurred in connection with the telecasting of the 1972 Awards ceremony. *See id.* § 4.11[B], at 4–56.

**17.** Section 7 provides that "[c]ompilations . . . shall be regarded as new works subject to copyright under the provisions of this title; but the publication of any such new [collective or derivative] works shall not affect the force or validity of any subsisting copyright upon the matter employed." The 1976 Act is even more explicit about the relationship between a collective work and its underlying components:

The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

17 U.S.C. app. § 103(b) (1976). The House Report makes clear that this section is intended to clarify an already existing, if not always understood, aspect of the 1909 Act:

Section 103(b) is also intended to define, more sharply and clearly than does section 7 of the present law, the important interrelationship and correlation between protection of preexisting and of "new" material in a particular work. The most important point here is one that is commonly misunderstood today: copyright in a "new version" covers only the material added by the later author, and has no effect one way or the other on the copyright or public domain status of the preexisting material.

H.R.Rep.No.1476, 94th Cong., 2d Sess. 57, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5659, 5670.

Section 7 of the 1909 Act (and the stronger corresponding language in section 103(b) of the 1976 Act) does not necessarily cause AMPAS's copyright notice to have no effect on the "force or validity" of the plaintiffs' common-law copyright. First, despite the language of section 7, a "divestive" publication by definition affects the validity of an underlying common-law copyright: it extinguishes it. Second, as we have noted, there is some question about what sort of "publication," if any, was involved in AMPAS's 1972 telecast.

**18.** *Gilliam* concerned an infringement claim by the members of the writing and performing group "Monty Python" with respect to a script used for a licensed BBC broadcast. BBC had obtained a statutory copyright in its program. ABC threatened to use the program, in an allegedly infringing manner, with the permission of BBC but not of "Monty Python." In upholding the plaintiffs' right to a preliminary injunction, *Gilliam* broadly stated that "the copyright in the underlying script survives intact despite the incorporation of that work into a derivative work." 538 F.2d at 20. Citing section 7's provision that the copyright in a derivative work does not affect the "force or validity" of a

**1104**

■ The possibility that the 1972 telecast placed the Compilation in the public domain must also be rejected. Even if the telecast was an "investing" publication sufficient to confer statutory rights to the collective work upon AMPAS, in whose name the copyright notice appeared, that one-time showing of the Compilation was only a "performance," which cannot constitute a "divesting" publication. *See Burke v. National Broadcasting Co.*, 598 F.2d 688, 691, 693 (1st Cir.), *cert. denied*, 444 U.S. 869, 100 S.Ct. 144, 62 L.Ed.2d 93 (1979); *Columbia Broadcasting System, Inc. v. Documentaries Unlimited, Inc.*, 42 Misc.2d 723, 727, 248 N.Y.S.2d 809, 812–13 (Sup.Ct.1964); *De Mille Co. v. Casey*, 121 Misc. 78, 87–88, 201 N.Y.S. 20, 28 (Sup.Ct.1923); 1 *Nimmer* § 4.11[B], at 4–55. As we have noted, rigorous standards apply in determining when distribution of copies of a work constitutes a "publication" sufficient to cause a loss of common-law copyright without acquisition of statutory protection. We therefore conclude that the Compilation is not in the public domain.

■ There remains for consideration the possibility that the 1972 telecast conferred statutory protection for the Compilation upon the plaintiffs, forcing on them an unintended exchange of their common-law copyright. We held in *Goodis v. United Artists Television, Inc.*, 425 F.2d 397 (2d Cir. 1970), that the author of a novel, serialized in the *Saturday Evening Post*, obtained a statutory copyright in his novel as a consequence of the *Post*'s obtaining copyright protection for each issue of the magazine by affixing to each issue a copyright notice in the *Post*'s name.

Though superficially analogous to this case, *Goodis* does not require a conclusion

that the plaintiffs have unwittingly obtained a statutory copyright in the Compilation. *Goodis* accorded statutory protection to the author of the novel in response to the argument of his infringer that publication by the *Post* had placed the novel in the public domain. That publication, involving nationwide distribution of copies of a magazine, was a "divesting" publication that unquestionably terminated the author's common-law rights. *Goodis* explicitly accorded the author statutory rights to protect him from unintentional forfeiture of all his rights due to publication with copyright notice in the "wrong" name. *See* 425 F.2d at 400. By contrast, the plaintiffs need no such protection because the 1972 telecast was not a "divesting" publication. Their common-law rights remain intact. The protective rationale of *Goodis* cannot be used to force a holder of a common-law copyright to exchange it for statutory rights, simply because the work was included in an "investing" publication of a collective work bearing a copyright notice in the compiler's name.

We conclude that the District Court properly permitted the jury to find that CBS infringed the plaintiffs' valid common-law copyright in the Compilation.

### C. *Unfair Competition*

CBS next contends that the plaintiffs may not maintain a claim that the CBS Chaplin retrospective unfairly competed with plaintiffs' plan to license "The Gentleman Tramp." The argument implicitly questions whether New York unfair competition law applies to the taking of one item of a plaintiff's property (the Compilation) and its use in competition with another item ("The Gentleman Tramp"). Explicitly, the argument asserts that the plaintiffs'

copyright in an underlying work, the Court observed that "the same principles [that apply] to derivative works adapted from material in which there is a statutory copyright also apply to material in which there is a common law copyright." *Id.* at 20 n.3. The plaintiffs here cite *Gilliam* to show that publication of a derivative work does not extinguish common-law

rights in an underlying component. However, even though the Court ruled that "Monty Python" was entitled to a preliminary injunction, the impact of the broadcast upon the group's common-law rights was specifically left for consideration at trial, since defendant had not objected to the group's "assertion of common law copyright in an unpublished script." *Ibid.*

claim, nominally based on misappropriation of the Compilation, ultimately rests on appropriation of the films, and that a state law claim based on misappropriation of federally copyrighted materials is preempted under the doctrine of *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). We consider, first, whether CBS's use of the Compilation is unfair competition under New York law and, second, whether such a state-law claim is preempted in the circumstances of this case.

The misappropriation branch of the unfair competition tort traces its lineage to the Supreme Court's decision in *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), upholding a decision enjoining INS from copying AP's news bulletins, which AP had compiled at considerable · effort and expense, and then selling the pirated information in competition with AP. With the subsequent decline of general federal common law, the doctrine was developed by the states, New York in particular; there it has flourished in a variety of factual settings, *see Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 792–96, 101 N.Y.S.2d 483, 488–93 (Sup.Ct.1950), *aff'd mem.*, 279 A.D. 632, 107 N.Y.S.2d 795 (1951), despite some early efforts by this Court to limit the doctrine to the narrow circumstances of the *INS* case, *see, e.g., RCA Manufacturing Co. v. Whiteman*, 114 F.2d 86, 90 (2d Cir.), *cert. denied*, 311 U.S. 712, 61 S.Ct. 393, 85 L.Ed. 463 (1940). *See generally Developments in the Law—Competitive Torts*, 77 Harv.L.Rev. 888, 933–35 (1964).

 An unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property, *e.g., International News Service v. Associated Press, supra.*

By contrast, in this case the Compilation was taken and used to compete unfairly against a different property, "The Gentleman Tramp." Despite the unusual facts, we are satisfied that the plaintiffs have established an unfair competition tort under New York law.

New York courts have noted the "incalculable variety" of illegal practices falling within the unfair competition rubric, *Ronson Art Metal Works, Inc. v. Gibson Lighter Manufacturing Co.*, 3 A.D.2d 227, 230–31, 159 N.Y.S.2d 606, 609 (1957), calling it a "broad and flexible doctrine" that depends "more upon the facts set forth ... than in most causes of action," *Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., supra*, 199 Misc. at 792, 101 N.Y.S.2d at 488, 489. It has been broadly described as encompassing "any form of commercial immorality," *id.* at 796, 101 N.Y.S.2d at 492, or simply as "endeavoring to reap where [one] has not sown," *International News Service v. Associated Press, supra*, 248 U.S. at 239, 39 S.Ct. at 72; it is taking "the skill, expenditures and labors of a competitor," *Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556, 567, 190 N.Y.S.2d 977, 986, 161 N.E.2d 197, 203 (1959), and "misappropriati[ng] for the commercial advantage of one person ... a benefit or 'property' right belonging to another," *Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., supra*, 199 Misc. at 793, 101 N.Y.S.2d at 489. The tort is adaptable and capacious. While it might be objected that such an amorphous cause of action is capable of mischievous application, even a modest interpretation comprehends the facts of this case. CBS unquestionably appropriated the "skill, expenditures and labor" of the plaintiffs to its own commercial advantage. Its actions, in apparent violation of its own and the industry's guidelines, were arguably a form of "commercial immorality." We are confident that the New York courts would call its conduct unfair competition.

 We next consider whether the plaintiffs' unfair competition claim, though fo-

cusing on misappropriation of the Compilation, is so inextricably related to CBS's use of excerpts from the copyrighted films as to encounter a possible preemption defense based on *Sears-Compco.* It is true that part of the reason CBS's 1977 retrospective was alleged to have undermined the marketability of "The Gentleman Tramp" was that the retrospective invaded the plaintiff's legal monopoly in the copyrighted Chaplin films, a monopoly they naturally relied upon to distinguish their biography from any competitor's. Nevertheless, the act of taking the Compilation, as an entity apart from the films, defines a distinct offense, caused distinct damage, and was the basis of the jury's finding of liability for unfair competition. The commercial effectiveness of CBS's retrospective and the efficiency with which it was produced and shown were undoubtedly enhanced by the use of the plaintiffs' artistry in fashioning the Compilation from the raw material of the films. Moreover, CBS's conduct in obtaining the Compilation from NBC was commercially wrongful in a more serious way than use of film excerpts would have been. A decision to use isolated film clips to memorialize Chaplin's life could perhaps have been viewed as an act done in the good faith belief that such use was fair; but the additional decision not only to use the film clips, but to use them in a distinct and original form whose commercial potential, as CBS knew, reflected someone else's effort and creativity, precludes any thought of good faith. Under the circumstances, we think that the misappropriation is what renders unfair CBS's competition with "The Gentleman Tramp." Indeed, the plaintiffs, as owners of the Compilation, would have had a viable claim for unfair competition even if they did not hold copyrights in the films.

Since the unfair competition claim is sufficiently based on the misappropriation of the Compilation, as distinct from the copyrighted films, the claim is not vulnerable to a preemption defense. Application of state unfair competition laws to unpublished works protected by common-law copyright is preserved from preemption, 17 U.S.C. § 2, and unaffected by the *Sears-Compco* preemption doctrine. *Columbia Broadcasting System, Inc. v. Documentaries Unlimited, Inc., supra,* 42 Misc.2d at 726, 248 N.Y. S.2d at 812. We therefore uphold the unfair competition claim.[19]

### D. *Damages*

■ CBS objects to the punitive damages awarded against it on the two common-law claims, arguing that punitive damages on such claims are contrary to law and public policy, and that the award is excessive, duplicative, and the result of passion and prejudice. We agree with Judge Lasker's careful analysis of these objections and with his conclusion that they are meritless. New York law clearly permits punitive damages where a wrong is aggravated by recklessness or willfulness, *Le Mistral, Inc. v. Columbia Broadcasting System,* 61 A.D.2d 491, 495, 402 N.Y.S.2d 815, 817 (1978), whether or not directed against the public generally, *Borkowski v. Borkowski,* 39 N.Y.2d 982, 387 N.Y.S.2d 233, 355 N.E.2d 287 (1976). CBS's further attempt to construct a preclusive federal policy from the First Amendment and the federal copyright law is equally unavailing. We have already concluded that CBS's conduct enjoyed no constitutional protection, and the policies prohibiting punitive damages in federal infringement actions are irrelevant to actions brought under state law.

■ As to the claim of excess amount, Judge Lasker correctly noted that punitive damages are within the jury's discretion and will not be disturbed unless they are grossly excessive. 503 F.Supp. at 1154.

---

**19.** We need not consider plaintiffs' further contention that even if the unfair competition claim were substantially based on misappropriation of the copyrighted films, the claim would not be preempted because the facts of this case indicate no conflict with federal policies.

The deterrent potential of an award of $410,000 must be measured by its likely effect on a national television network with 1977 earnings of some $217,000,000, *see id.* at 1154 n.10. We agree with Judges Ward and Lasker that the award was neither excessive nor the result of passion and prejudice. On the final question of duplication in the two separate awards of punitive damages, $300,000 on the common-law copyright claim and $110,000 on the unfair competition claim, we are satisfied that the awards reflect assessments of distinct harms caused by distinct acts. Moreover, CBS requested the special verdict forms that elicited the separate awards on the two common-law claims. Having insisted on a fragmented assessment of punitive damages, CBS cannot complain that the jurors followed their instructions.

For the reasons stated above, we affirm the judgment of the District Court.